**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-1275
_____


REAL ALTERNATIVES, INC.; KEVIN I. BAGATTA,
ESQ.; THOMAS A. LANG, ESQ.; CLIFFORD W.
MCKEOWN,
Appellants

v.


SECRETARY DEPARTMENT OF HEALTH AND
HUMAN SERVICES; SECRETARY UNITED STATES
DEPARTMENT OF LABOR; SECRETARY UNITED
STATES DEPARTMENT OF THE TREASURY; UNITED
STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES; UNITED STATES DEPARTMENT OF
LABOR; UNITED STATES DEPARTMENT OF
TREASURY


_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No.: 1:15-cv-00105)
District Judge: Honorable John E. Jones, III
_____

Argued November 3, 2016


Before: JORDAN, GREENAWAY, JR., and RENDELL,
Circuit Judges


(Opinion Filed: August 4, 2017)


Matthew S. Bowman **(Argued)**
David A. Cortman
Alliance Defending Freedom
440 First Street, NW
Suite 600
Washington, DC 20001

        Counsel for Appellants Real Alternatives, Inc.;
        Kevin I. Bagatta, Esq.; Thomas A. Lang, Esq.;
        Clifford W. McKeown




Kevin H. Theriot
Elissa M. Graves

Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, AZ 85260


Randy Wenger
Independence Law Center
23 North Front Street
Harrisburg, PA 17101

                    Counsel for Appellants Real Alternatives, Inc.;
                    Kevin I. Bagatta, Esq.; Thomas A. Lang, Esq.;
                    Clifford W. McKeown




Benjamin C. Mizer
Peter J. Smith
Mark B. Stern
Alisa B. Klein
Patrick G. Nemeroff
Megan Barbero
Joshua M. Salzman **(Argued)**
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530

Counsel for Appellees Secretary Department of Health and Human Services; Secretary United States Department of Labor; Secretary United States Department of the Treasury; United States Department of Health and Human Services; United States Department of Labor; United States Department of Treasury

Richard B. Katskee
Natacha Y. Lam
Americans United for Separation of Church and State
1901 L Street, NW
Suite 400
Washington, DC 20036

Seth M. Marnin
David L. Barkey
Anti-Defamation League
605 Third Avenue
New York, NY 10158

Counsel for Amici Curiae Americans United for Separation of Church and State; Anti-Defamation League; Central Conference of American Rabbis;

Hadassah, The Women's Zionist
Organization of America, Inc.; National
Council of Jewish Women; People for
the American Way Foundation; Union
for Reform Judaism; Women of Reform
Judaism

---

O P I N I O N

---

**RENDELL**, Circuit Judge:

One of the many provisions of the Patient Protection
and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119
(2010), requires employer-provided health insurance plans to
cover an array of preventative services, including FDA-
approved contraceptives, at no cost to participating
employees. Employees have the option of seeking out
covered medical providers and using their services, in which
case they are reimbursed, or they can choose not to use them.
The particular provision that includes contraceptive coverage
is commonly referred to as the "Contraceptive Mandate," and

it includes a limited exemption for houses of worship and their integrated auxiliaries. *See* 45 C.F.R. § 147.131(a); 77 Fed. Reg. 8,725, 8,726 (Feb. 15, 2012). A wider set of religious non-profit and for-profit employers may receive an accommodation whereby they opt out of providing contraceptive coverage, with the Government then arranging for their employees to receive the coverage through third parties at no cost to, and with no participation of, the objecting employers. *See* 45 C.F.R. § 147.131(b)–(c); 78 Fed. Reg. 39,870, 39,874–39,875 (July 2, 2013); *Zubik v. Burwell*, 136 S. Ct. 1557, 1559 (2016).

Two years after we upheld this opt-out accommodation in *Geneva College v. Secretary United States Department of Health and Human Services*, 778 F.3d 422, 427 (3d Cir. 2015), *vacated and remanded sub nom. Zubik*, 136 S. Ct. at 1561, we now confront the house-of-worship exemption. This appeal presents two primary questions that again derive from the purported intersection of the Contraceptive Mandate and religion: (1) whether the Contraceptive Mandate must exempt a secular anti-abortion group with no religious affiliation, and (2) whether an employee's religious beliefs are substantially burdened by the law's requirement that his or her employer's insurance plan cover contraceptives. After careful review, but without any hesitation, we answer both questions in the negative.

Appellant Real Alternatives urges that, pursuant to the Equal Protection Clause of the Fifth Amendment, if a religious organization may be exempted from the Contraceptive Mandate, then non-religious entities with an identical stance on contraceptives must be exempted as well. Real Alternatives additionally challenges the Contraceptive

6

Mandate and the criteria for the exemption as not only arbitrary and capricious under the Administrative Procedures Act but also contrary to federal law.

The other appellants, three employees of Real Alternatives, bring individual challenges to the Contraceptive Mandate. They argue that the Contraceptive Mandate violates the Church Amendment, 42 U.S.C. § 300a–7(d). They also argue that maintaining a health insurance plan that covers contraceptives through their employer violates their religious rights under the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb-4 ("RFRA").

The District Court denied Appellants' motion for summary judgment in its entirety and granted the Government's cross-motion for summary judgment in its entirety. Because we agree with the District Court's rulings on all of the issues raised, we will affirm.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

#### 1. The Affordable Care Act and the Contraceptive Mandate

In 2010, Congress passed the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively, the "ACA"). The ACA requires non-grandfathered group health plans and insurance providers to cover four categories of preventative health services, without

7

cost-sharing, as provided for in guidelines supported by the Health Resources and Services Administration ("HRSA"), an arm of the Department of Health and Human Services ("HHS").[1] One of these four categories is "preventative care and screenings" for women.

HHS requested assistance from the Institute of Medicine ("IOM"), a non-profit division of the National Academy of Sciences, to develop guidelines on the specific preventative services for women to be covered under the ACA (none existed at the time the ACA was passed). The IOM recommended that HRSA endorse a list of services that included "[FDA]-approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity." Institute of Medicine, Clinical Preventative Services for Women: Closing the Gaps 10 (2011). Examples of FDA-approved contraceptive methods are diaphragms, oral contraceptives, intrauterine devices, and emergency contraceptives. *Id.* at 105–06. HRSA adopted the IOM's guidelines in full. Health Resources & Service Administration, Women's Preventative Service Guidelines, *available at* https://www.hrsa.gov/womensguidelines/ (last visited Jan. 27, 2017). In doing so, HRSA required every group health plan and health insurance plan to include coverage for these preventative care services to employees working at non-

---

[1] Grandfathered health plan coverage is that which has existed continually prior to March 23, 2010 and has not undergone any of several specified changes since that time. 29 C.F.R. § 2590.715-1251 (2010).

exempt employers (the "Contraceptive Mandate"). It did not require anything from the employee.

## 2. Exemption to the Contraceptive Mandate

At the same time as HRSA adopted IOM's recommended guidelines, an exemption from the Contraceptive Mandate for certain religious employers was proposed as an interim final regulation (the "Exemption"). 76 Fed. Reg. 46,621 (Aug. 3, 2011). Commenters to the proposed guidelines had suggested that requiring religious employers to sponsor group health plans that provide contraceptive services could impinge on those employers' religious freedom. *Id*. at 46,623. In light of those comments, HHS and the Departments of Labor and Treasury (collectively, the "Departments"), the agencies named in Real Alternatives's underlying lawsuit, authorized HRSA to exempt certain religious employers from the Contraceptive Mandate. The Departments specified that they sought "to provide for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions" and that "[s]uch an accommodation would be consistent with the policies of States that require contraceptive services coverage, the majority of which simultaneously provide for a religious accommodation."[2] *Id*.

---

[2] Though the language here refers to religious *accommodation*, these statements refer to what would ultimately become the *exemption* given to religious employers under the ACA. The Departments established a separate accommodation for certain employers, addressed *supra*, that is not at issue in this litigation.

9

The Departments originally defined a religious employer as an employer that:

> (1) has as its purpose the inculcation of religious values;
> (2) primarily employs persons who share its religious tenets;
> (3) primarily serves persons who share its religious tenets; and
> (4) is a non-profit organization under Section 6033(a)(1) and Section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code.[3]

*Id.* The Departments also noted that HRSA's "discretion to establish an exemption applies only to *group* health plans sponsored by certain religious employers and *group* health insurance offered in connection with such plans," and thus "health insurance issuers in the *individual* health insurance market would not be covered under any such exemption." *Id.* at 46,623–24 (emphasis added). The Departments formally adopted the four-part definition for exempted employers in 2012. They also created a one-year safe harbor for non-exempted, non-profit organizations with religious objections, and announced that they would develop and propose changes to the regulation that "would meet two goals—providing

---

[3] Section 6033 of the Internal Revenue Code refers in relevant part to "churches, their integrated auxiliaries, and conventions or associations of churches," and "the exclusively religious activities of any religious order." 26 U.S.C. § 6033(a)(3)(A)(i).

contraceptive coverage without cost-sharing to individuals who want it and accommodating non-exempted, non-profit organizations' religious objections to covering contraceptive services . . . ." 77 Fed. Reg. at 8,727.

The final rules regarding the Exemption went into effect in 2012. The Departments replaced the multifactor religious employer test with one definition, essentially the fourth prong of the previous test: "[A]n employer that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code," which addresses churches and their integrated auxiliaries. 78 Fed. Reg. at 39,874. The Departments noted that this new definition "continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement." *Id*. The Departments also stated:

> Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan.

*Id*. The Departments added that their statement about a religious employer's likelihood to hire employees who share religious beliefs opposing contraceptives was made in response to commenters concerned that the Exemption would "undermine the [G]overnment's compelling interests in

11

promoting public health and ensuring that women have equal access to health care . . . ." 80 Fed. Reg. 41,318, 41,325 (July 14, 2015); *see also* 78 Fed. Reg. at 39,887 ("Nor do the exemption for religious employers and the accommodations for eligible organizations undermine the [G]overnment's compelling interests.").

In 2015, the Departments stated that the Exemption was "provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship, such as the special treatment given to those organizations in the [Internal Revenue] Code." 80 Fed. Reg. at 41,325. They continued:

> This exemption . . . is consistent with their special status under longstanding tradition in our society and under federal law, and is not a mere product of the likelihood that these institutions hire coreligionists. Hiring coreligionists is not itself a determinative factor as to whether an organization should be accommodated or exempted from the contraceptive requirements.

*Id.*

## B. Factual Background and Procedural History

### 1. Appellant Real Alternatives

Appellant Real Alternatives is a non-profit, non-religious, anti-abortion organization. It does not hold itself out as a religious entity, is not incorporated as such, and has

12

not adopted any religious views or positions. Its primary purpose is to provide "life-affirming alternatives to abortion services," and it offers pregnancy and parenting support programs as well as abstinence education services to women and families throughout Pennsylvania, Michigan, and Indiana. J.A. 92–93.

Real Alternatives avers that its views on human life are based on science, reason, and non-religious philosophical principles. *Id*. at 93. In addition to opposing abortion, Real Alternatives opposes the use of all contraceptives because it considers these drugs to be "morally wrong." *Id*. at 94.

Real Alternatives administers its programs through networks of social service agencies, which Real Alternatives hires as subcontractors. It requires all of its subcontracting organizations to share its views and to agree not to provide or recommend contraceptives or abortion. It only hires employees who share the company's stance on contraceptives and abortion.

Since 2008, Real Alternatives has excluded contraceptive care from the health insurance plan it offers to its employees. Real Alternatives alleges that in 2014, because of the ACA, its insurer stopped omitting contraceptive care from coverage and, as a result, a new plan was offered to employees.[4] According to Real Alternatives, were it not for the ACA, its insurance provider would be willing to revert to providing a plan that omits contraceptive coverage. Real

---

[4] Because the original insurance plan was terminated, it does not qualify for grandfathered status.

13

Alternatives avers that the Contraceptive Mandate violates the Equal Protection Clause and the Administrative Procedure Act ("APA").

### 2. Appellants Real Alternatives Employees

Appellants Kevin I. Bagatta, Thomas A. Lang, and Clifford W. McKeown work for Real Alternatives (the "Real Alternatives Employees"). They are, respectively, the President, Vice President of Operations, and Vice President of Administration of Real Alternatives. They are the only full-time employees of Real Alternatives, and they aver that they share the company's beliefs concerning contraceptive drugs. Each employee receives health insurance coverage through Real Alternatives, as do their wives and total of seven minor children, three of whom are female.

The Real Alternatives Employees aver that the Contraceptive Mandate violates the Church Amendment. They also aver that the Contraceptive Mandate violates their religious rights under RFRA. Specifically, they allege that their "sincerely held religious beliefs prohibit them from using, supporting, or otherwise advocating the use of abortifacients, or participating in a health insurance plan that covers such items for themselves or their families." J.A. 123.

### 3. District Court Opinion

The District Court denied Real Alternatives's motion for summary judgment in its entirety and granted the Government's cross-motion for summary judgment in its

14

entirety.[5] We find the District Court's analysis informative and persuasive for the most part, and we review it here.

The District Court began by addressing Real Alternatives's equal protection claim, finding in the first instance that Real Alternatives is not similarly situated to religious employers with comparable objections to the Contraceptive Mandate because, notwithstanding those objections, they do not share the same bases for those positions—namely, religion versus a single secular position. As discussed *infra*, the District Court raised and distinguished two relevant federal cases, *Center for Inquiry, Inc., v. Marion Circuit Court Clerk*, 758 F.3d 869 (7th Cir. 2014), and *March for Life v. Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015). The District Court also focused on the "vast history of legislative protections [that] exist[] to safeguard religious freedom," and contrasted "[m]oral philosophies," which it found "have been historically unable to enjoy the same privileged state." J.A. 35. The District Court continued that even if Real Alternatives were similarly situated to a house of worship, respecting religious autonomy plainly constitutes a legitimate purpose to allow the classification to stand under rational basis review. The District Court examined the Government's statements in the ACA regulations and found that it had sufficiently identified religious freedom as the purpose furthered by the Exemption. The District Court concluded its equal protection analysis by expressing concern that

---

[5] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, 2201, & 2202; 42 U.S.C. § 2000bb-1; and 5 U.S.C. § 702. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

15

"[a]llowing adherence to a single moral belief . . . to be indistinguishable from religion or an entire moral creed . . . leads us down a slippery slope." *Id.* at 42–43. It reasoned that "finding a singular moral objection to law on par with a religious objection" could very well lead to a flood of similar objections. *Id.* at 44.

Next, the District Court concluded that Real Alternatives's claim that the Contraceptive Mandate is arbitrary and capricious "fail[s] for the same reasons that [its] Fifth Amendment equal protection claim lacked merit." *Id.* at 49; *see also id.* at 48 (noting that "[t]he standard for determining whether an [APA] violation exists under the arbitrary and capricious standard is markedly similar to rational basis review"). The District Court also rejected Real Alternatives's argument that the Contraceptive Mandate violates federal law—namely, the ACA and the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009 (the "Weldon Amendment")—as well as the Real Alternatives Employees' claim that it violates the Church Amendment.

Finally, the District Court rejected the Real Alternatives Employees' RFRA claim. It found that the burden at issue—maintaining an insurance plan that includes coverage for preventative services—was not substantial *enough* based on the Supreme Court's approach in other RFRA cases. *See* J.A. 62 (first citing *Bowen v. Roy*, 476 U.S. 693, 703 (1986) (holding that the Government could condition public benefits on the religiously prohibited act of providing a social security number without trampling on the beneficiary's free exercise rights); then citing *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449 (1988)

16

(finding that building a road through sacred land did not violate the free exercise rights of those who believed in the land's religious significance)). The District Court concluded in the alternative that, even if the Contraceptive Mandate did impose a substantial burden, it would still satisfy RFRA because it was the least restrictive means of furthering the Government's compelling interest in a broadly applicable system of health care that advances public health and gender equality.

## II. DISCUSSION

### A. Standard of Review

We exercise plenary review over a district court's grant of summary judgment, applying the same standard that the district court should have applied.[6] *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001). A court grants summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There are no material facts in dispute; the questions raised by the parties are matters of law, which we review *de novo*. *Shuman ex. rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 146 (3d Cir. 2005).

---

[6] When the parties were before the District Court, Real Alternatives moved for summary judgment and the Departments moved to dismiss or, in the alternative, for summary judgment. The District Court treated the Departments' motion as one for summary judgment, and we will review accordingly.

17

**B. Equal Protection Claim[7]**

Real Alternatives challenges the constitutionality of the Exemption's scope, arguing that it violates the organization's right to equal protection under the Fifth Amendment by exempting only religious employers and not other secular entities, such as itself, that oppose the requirements set forth in the Contraceptive Mandate. Real Alternatives urges that "[t]here is no rational purpose to impose the Mandate on those who do not want the items and will not use them," and contends that it is excluded from the Exemption "simply because [it] is a 'non-religious ethical group[]' instead of a church." Appellants' Br. at 28 (final alteration in original). If churches receive a religious exemption, the argument goes, then so too must non-religious entities.

**1. Legal Standard**

To prevail on its equal protection claim, Real Alternatives must show that the Government has treated it differently from a *similarly* situated party *and* that the Government's explanation for the differing treatment does *not* satisfy the relevant level of scrutiny. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439–40 (1985). The

---

[7] The equal protection and APA claims are brought both by Real Alternatives the entity and by Bagatta, Lang, and McKeown, the organization's three full-time employees. For the sake of concision, we will refer to this group of appellants as "Real Alternatives."

parties agree, as they must, that rational basis review is the applicable standard. Thus, there must be "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *United States v. Pollard*, 326 F.3d 397, 407 (3d Cir. 2003) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Rational basis review confers a "presumption of validity" on legislation, and "the plaintiff must negate every conceivable justification for the classification in order to prove that the classification is wholly irrational." *Brian B. ex rel. Lois B. v. Pa. Dep't of Educ.*, 230 F.3d 582, 586 (3d Cir. 2000) (citing *FCC v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993)).

### 2. Analysis

We must first determine whether Real Alternatives is similarly situated to a religious employer, such that the Exemption must be available to the group absent a legitimate rationale. There is no question it is not.

Real Alternatives leans on its company-mandated eschewal of contraceptives in an attempt to situate itself in lockstep with religious employers who can avail themselves of the Exemption, contending that it is in fact "more favorably" or "identically" situated to houses of worship because *all* of its employees by definition oppose contraceptive coverage. Appellants' Br. at 28, 30. In making this claim, Real Alternatives invokes *Center for Inquiry*, in which the Seventh Circuit struck down an Indiana statute that permitted religious officials to solemnize marriages but prohibited their counterparts from secular groups from doing the same. 758 F.3d at 875. There, the court reasoned that "[a]n accommodation cannot treat religions favorably when

19

secular groups are identical with respect to the attribute selected for that accommodation." *Id.* at 872.

But Real Alternatives ignores key distinctions between that case and this one. Most notably, Real Alternatives disregards the stark contrast between itself and the appellant in *Center for Inquiry*, a humanist group that resembles a "religion[] in everything except belief in a deity." *Id.* at 871. Real Alternatives is a completely different type of entity, particularly because of its structure, aim, purpose, and function in its members' lives. Indeed, Real Alternatives's credo is limited to a one-sentence mission statement that says it "exists to provide life-affirming alternatives to abortion services throughout the nation." J.A. 92. In *Center for Inquiry*, the humanist organization explicitly argued that "its methods and values play the *same* role in its members' lives as religious methods and values play in the lives of adherents." 758 F.3d at 871 (emphasis added). Real Alternatives makes no such claim, as it is solely concerned with administering programs that reflect its moral opposition to contraceptives and abortion. Thus, *Center for Inquiry* does not help Real Alternatives demonstrate that it is similarly situated to a religious entity.

However, Real Alternatives does bear some resemblance to the plaintiffs in *March for Life*, the district court decision upon which it heavily relies. There, the District Court for the District of Columbia granted summary judgment to a non-profit, secular anti-abortion group on its equal protection challenge to the Contraceptive Mandate. We cannot accept the district court's reasoning in that case. Relying almost exclusively on *Center for Inquiry*, the district court found that the secular group at issue was "similarly

20

situated with regard to the precise attribute selected for accommodation"—specifically, a shared view that abortion is wrong. *March for Life*, 128 F. Supp. 3d at 126 (emphasis omitted). But that court—and, by extension, Real Alternatives—ignored a crucial point: Unlike the corporation in *Center for Inquiry*, which involved a comprehensive belief system that happened not to be deity-centric, a secular anti-abortion group mirrors a single-issue interest group and not a religious organization that takes advantage of the Exemption. We agree with Judge Jones's observation regarding the disparities between the two groups: "In every other respect, they are different. Real Alternatives is an employer, a company, and not a belief system . . . and its single mission statement cannot guide believers comprehensively throughout life as a religion can." J.A. 42; *cf. United States v. Seeger*, 380 U.S. 163, 187 (1965) (accommodating a secular pacifist's objections to the draft because his beliefs "occup[y] the same place in his life as the belief in a traditional deity holds in the lives of" adherents to religion).

Real Alternatives is in no way like a religious denomination or one of its nontheistic counterparts—not in structure, not in aim, not in purpose, and not in function. We do not doubt that Real Alternatives's stance on contraceptives is grounded in sincerely-held moral values, but "religion is not generally confined to one question or one moral teaching; it has a broader scope." *Malnak v. Yogi*, 592 F.2d 197, 209 (3d Cir. 1979) (Adams, J., concurring). We have accordingly noted three "guideposts" courts ought to use when identifying a religion:

> First, a religion addresses fundamental and ultimate questions having to do with deep and

21

> imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs.

*Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3d Cir. 1981). We thus agree with Amici Curiae that "Real Alternatives is functionally similar not to a church, but to the countless nonreligious 501(c)(3) nonprofit organizations that take morally informed positions on some discrete set of issues," such as the NAACP and the National Organization for Marriage.[8] Amici Curiae Br. at 16.

---

[8] We further agree with Amici Curiae that while commitment to an anti-abortion platform may be important to the people who hold them, that commitment is "not a religion in any legally or theologically accepted sense; and organizations do not become quasi-churches for equal-protection purposes merely by espousing a commitment of that sort." Amici Curiae Br. at 15; *see also Malnak*, 592 F.2d at 208–10 (Adams, J., concurring) (defining nontheistic belief system as "religion" if it (1) deals with questions of "ultimate concern"; (2) provides answers that speak to comprehensive and ultimate truth; and (3) has formal characteristics analogous to those of traditional religions); *Wash. Ethical Soc'y v. District of Columbia*, 249 F.2d 127, 128 (D.C. Cir. 1957) (finding nontheistic ethical society that had regular Sunday meetings, "leaders" who preached to members and provided spiritual guidance, and ceremonies for naming, marrying, and burying members qualified for tax exemption as church); *Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 200 F. Supp. 3d 553, 562 n.4 (E.D. Pa. 2016) (distinguishing

22

Real Alternatives overemphasizes its shared opposition to contraceptive coverage while inexplicably dismissing the Government's repeated statements that the Exemption "was provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship . . . ." 80 Fed. Reg. at 41,325. But framing the Exemption—or any religious exemption for that matter—so broadly as to encompass any employer who disagrees with any aspect of an underlying law lies in direct contradiction to the Supreme Court's refusal to broaden religion-based exemptions in similar contexts. *See United States v. Lee*, 455 U.S. 252, 260–61 (1982) (in a Social Security-related matter, rejecting a claim to extend a limited exemption because "[c]onfining the . . . exemption . . . provided for a narrow category which was readily identifiable," and noting that "every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs"). Permitting Real Alternatives to qualify for the Exemption would similarly run afoul of this country's vast history of legislative protections that single out and safeguard religious freedom

---

between plaintiff's beliefs, which "consist[ed] solely of his 'conscience' and personal moral code," and the "structural characteristics" of secular moral systems that are equivalent to religion except for non-belief in God); *Fellowship of Humanity v. Cty. of Almaeda*, 315 P.2d 394, 409–10 (Cal. Dist. Ct. App. 1957) (finding that nontheistic fellowship qualified for tax exemption as church because "it is conceded that in all respects the Fellowship's activities are similar to those of the theistic groups, except for their belief or lack of belief in a Supreme Being").

but not moral philosophy. *See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338 (1987) ("Where, as here, [G]overnment acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities.");[9] Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc ("RLUIPA") (requiring religious accommodation for zoning and land use regulations); Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1003(b)(2) (exempting "church plan[s]" from retirement-plan regulations); Internal Revenue Code, 26 U.S.C. §§ 6033(a)(3)(A)(i), (iii) (carving out "churches, their integrated auxiliaries, . . . conventions or associations of churches," and "the exclusively religious activities of any religious order" from a tax-filing requirement); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1(a) (requiring that employers not discriminate on the basis of religion). If mere disagreement, however vehemently felt, were sufficient to bring an equal protection claim, virtually any law implicating religion would be rendered moot because the exemption would be too easy to invoke.[10] *Cf. Cutter v.*

---

[9] We do not find persuasive Real Alternatives's belabored efforts to distinguish *Amos*, and we agree with the District Court that the Supreme Court's holding in that case is applicable here.

[10] We share the concerns of Amici Curiae that if such disagreement were enough to substantiate an equal protection claim, there would also be strong disincentives from *granting* any religious exemption because of how easy it would be to utilize or to extend it, thereby seriously undermining

*Wilkinson*, 544 U.S. 709, 724 (2005) (acknowledging that "all manner of religious accommodations would fall" if the Court struck down one law that implicated religion because of the similarities among religious accommodation laws).

Finally, even if Real Alternatives were deemed similarly situated to a religion, the group's challenge would *still* fail because of the historic principle of respect for the autonomy of genuine religions. This principle provides the legitimate purpose for the preferential treatment of religious organizations. The Exemption "provide[s] for a religious accommodation that respects the unique relationship between a house of worship and its employees in ministerial positions." 76 Fed. Reg. at 46,623. It "was provided against the backdrop of the longstanding governmental recognition of a particular sphere of autonomy for houses of worship," is "consistent with their special status under longstanding tradition in our society and under federal law, and is not a mere product of the likelihood that these institutions hire coreligionists." 80 Fed. Reg. at 41,325. Real Alternatives brazenly dismisses these statements as disingenuous.[11] In

countless legislative and regulatory programs. Relatedly, there would be immense pressure to repeal the thousands of religious accommodations that have been enacted at the federal, state, and local levels for fear that they would become vehicles to avoid compliance by anyone who dislikes the underlying laws.

[11] Without any supporting evidence, Real Alternatives repeatedly contends that the Government is asking the Court "to ignore the actual explanation in its regulations," *i.e.*, the likelihood of religious employees using contraceptives, "and

doing so, it misses a crucial point about rational basis review: It is "constitutionally irrelevant whether this [legitimate] reasoning in fact underlay the legislative decision" because this Court has never insisted that a legislative body articulate its reasons for enacting a statute. *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980); *see also Beach Commc'ns*, 508 U.S. at 318 (applying *Fritz* to an administrative action). In any event, the attribute Congress selected for classification is not opposition to contraceptives; it is status as a house of worship and based on the long-established governmental desire to respect the autonomy of houses of worship regardless of their particular stance on contraceptives.

It is beyond dispute that respecting church autonomy is a legitimate purpose—one that not only satisfies rational basis review but also is enshrined in the constitutional fabric of this country. Principles of noninterference trace back to "the text

---

instead to suppose that the exemption was offered solely because of the 'church character' of some religious employers." Appellants' Reply Br. at 7. This theory hinges on the Government's acknowledgment that "employees of employers availing themselves of the exemption would be less likely to use contraceptives even if contraceptives were covered under their health plans." 77 Fed. Reg. at 8,728. While we agree that likelihood of use would not alone satisfy rational basis review, that statement was part of the Government's explanation that the Exemption "does not undermine the overall benefits" of the Contraceptive Mandate. *Id*. It does not negate or in any way undermine the actual and legitimate purpose of the historic respect for religion put forth by the Government.

26

of the First Amendment itself, which gives special solicitude to the rights of religious organizations," and recognizes their "independence from secular control or manipulation—in short, [their] power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 704, 706 (2012) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)) (internal quotation marks omitted). Even when noninterference is not strictly required, the Government has discretion to grant certain religious accommodations subject to constitutional limitations.[12] *See Cutter*, 544 U.S. at 720–22. These accommodations may be extended to houses of worship and religious denominations without applying to all nonprofit entities in order to "alleviate significant governmental interference with the ability of religious

---

[12] The First Amendment prohibits the Government from inserting itself in theological disputes, appointments of ministers, or questions of distribution of church property; the Government may not dictate to houses of worship what to believe or how to structure their relations with clergy to implement and teach those beliefs. *See, e.g.*, *Hosanna-Tabor*, 132 S. Ct. at 706 (employment decisions for ministers); *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713–14 (1976) (internal theological disputes and religious tribunals); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) (church property); *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929) (appointment of clergy).

organizations to define and carry out their religious missions."[13]  *Amos*, 483 U.S. at 335; *see also Walz v. Tax Comm'n*, 397 U.S. 664, 676 (1970) (upholding a property tax exemption for houses of worship); *Hosanna-Tabor*, 132 S. Ct. at 706 (finding a "special rule for ministers grounded in the Religion Clauses themselves").

We reiterate, however, that Real Alternatives cannot satisfy the first prong of a successful equal protection claim. Finding all single-issue non-profit organizations to be similarly situated to houses of worship based on their adherence to a shared position on one issue would expand religious exemptions beyond what is constitutionally required.  That a legitimate purpose of the highest order— respect for religious autonomy—justifies the Exemption only underscores the inevitability of our conclusion.  We therefore find that Real Alternatives's equal protection claim fails as a matter of law.

## C. APA Claim

Real Alternatives asserts two claims under the APA: (1) the Contraceptive Mandate is arbitrary and capricious because it does not serve a rational governmental purpose as

---

[13] In this way, *Center for Inquiry* may be distinguished as an outlier example of organized secular belief systems gaining protected treatment.  The District Court correctly noted that "the majority of precedent continues to support preferential treatment for religion under the law, without explicitly extending that treatment to include secular beliefs." J.A. 36.

applied to Real Alternatives, an organization that employs only people who oppose contraceptive coverage; and (2) it violates the Constitution and federal law.  Both claims lack merit.

### 1.  Legal Standard

A reviewing court may "hold unlawful and set aside agency action" that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "(B) contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(A)–(B).

We have held that the standard for determining whether an APA violation exists under the arbitrary and capricious standard is substantially similar to rational basis review:

> Agency action is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently.  If [an] agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases.  Review of an equal protection claim in the context of agency action is similar to that under the APA.  That is, *an agency's decision must be upheld if under the Equal Protection Clause, it can show a rational basis for its decision.*  As such, the equal protection argument can be folded into the APA argument, since no suspect class is involved and the only question is whether the . . . treatment of

[appellees] was rational (i.e., not arbitrary and capricious).

*Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs.*, 747 F.3d 172, 179–80 (3d Cir. 2014) (alteration in original) (citations and internal quotation marks omitted) (emphasis added).

## 2. Analysis

Because we find that Real Alternatives's equal protection claim fails, we need not reexamine its arbitrary and capricious claim, which is subject to the same standard of review. *Id.*

Real Alternatives argues that the Contraceptive Mandate also violates the APA because it infringes on two other federal laws:  the ACA and the Weldon Amendment. The Real Alternatives Employees argue that the Contraceptive Mandate also violates the Church Amendment and, therefore, the APA.  We disagree with these contentions and find no violations.  We address each law in turn.

### a. ACA

The ACA states that none of its provisions "shall be construed to require a qualified health plan to provide coverage of [abortion] services as part of its essential health benefits for any plan year."  42 U.S.C. § 18023(b)(1)(A)(i). Real Alternatives argues that the Contraceptive Mandate violates this provision by "requiring coverage of certain 'FDA-approved contraceptives' which act as abortifacients, in that they cause the demise of human embryos after

30

conception and before and/or after implantation in the uterus." Appellants' Br. at 57. Real Alternatives does not cite any statutory or regulatory definition of abortion that includes contraceptives.[14]

However, longstanding FDA regulations treat pregnancy as "the period of time from implantation until delivery," 45 C.F.R. § 46.202(f), and categorize drugs that may prevent implantation as contraceptives rather than as abortifacients. 62 Fed. Reg. 8,610, 8,611 (Feb. 25, 1997) ("Emergency contraceptive pills are not effective if the woman is pregnant; they act by delaying or inhibiting ovulation, and/or altering tubal transport of sperm and/or ova (thereby inhibiting fertilization), and/or altering the endometrium (thereby inhibiting implantation)."). Further, we defer to the Government's definition because "this Court will normally accord particular deference to an agency interpretation of longstanding duration." *Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (internal quotation marks omitted). Thus, we conclude that the Contraceptive Mandate does not require coverage for abortion services and that Real Alternatives's claim to the contrary fails.

### b. Weldon Amendment

---

[14] In its brief, Real Alternatives relies on a number of dictionary definitions to suggest, contrary to statutory and regulatory definitions, that the modes of contraceptives covered by the Contraceptive Mandate are capable of inducing abortion.

31

Real Alternatives raises a similar claim based on the Weldon Amendment, which requires that no funds provided by the ACA's underlying appropriations bill be made available to a federal agency or program that "subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 112-74, §§ 506, 507, 125 Stat. 786, 1111–12 (Dec. 23, 2011). This claim fails for the reasons stated in the preceding section.[15]

### c. Church Amendment

The final APA claim asserts a violation of the Church Amendment, which prohibits an individual from being required to "perform or assist in the performance of any part of a health service program or research activity funded . . . by the Secretary of [HHS] if his performance or assistance . . . would be contrary to his religious beliefs or moral

---

[15] *See also* J.A. 51 (noting Representative Weldon's statement when proposing the eponymous amendment: "The provision of contraceptive services has never been defined as abortion in Federal statute, nor has emergency contraception, what has commonly been interpreted as the morning-after pill. Now, some religious groups may interpret that as abortion, but we make no reference in this statute to religious groups or their definitions; and under the current FDA policy that is considered contraception, and it is not affected at all by this statute.").

convictions."[16] 42 U.S.C. § 300a-7(d). This claim fails for lack of standing. The Real Alternatives Employees purchase their health insurance from a company in the health insurance market, not from HHS or an HHS-administered health insurance program that falls under the purview of the Church Amendment. *See Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 449–50 (W.D. Pa. 2013) (where individuals obtain health insurance through their employer, who in turn purchases coverage from the private health insurance market (and not HHS), the Church Amendment is not implicated) (citing *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).

## D. RFRA

We now turn to the RFRA claim, which presents a question of first impression for this Court: whether employees, who oppose contraceptives on religious grounds but work for secular employers, experience a substantial burden on their religious exercise when the Government regulates group health care plans and health care insurance providers by requiring them to offer health insurance coverage that includes coverage for services the employees find incompatible with their religious beliefs. This claim is distinct from an employer's RFRA claim objecting to the mandated provision of contraceptive services that was found

---

[16] The Church Amendment claim was brought only by the Real Alternatives Employees because the Church Amendment applies only to individuals.

to be meritorious in *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2775 (2014).[17]

Under RFRA, the "Government may *substantially* burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b) (emphasis added). The "exercise of religion" constitutes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

Congress enacted RFRA in 1993 in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), which overruled the earlier method of analyzing free exercise claims used in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). *See Geneva*, 778 F.3d at 430. The earlier decisions used a balancing test that took into account whether the

---

[17] Echoing the District Court, we state what we consider to be obvious: *Hobby Lobby* did not answer the RFRA question we confront today. In *Hobby Lobby*, the Supreme Court found that an employer's *provision*, not an individual's *maintenance*, of coverage may violate RFRA. 134 S. Ct. at 2778. As they did before the District Court, the Real Alternatives Employees ignore this important distinction and attempt to stretch the holding of *Hobby Lobby* well beyond its factual confines. The Dissent similarly misstates the applicability of *Hobby Lobby*, characterizing the issue there as "very like the one at issue here." Dissent Op. at 14.

34

challenged action imposed a substantial burden on the practice of religion, and if it did, whether it was needed to serve a compelling governmental interest. *Id.* *Smith* rejected this test because applying it whenever a person objected on religious grounds to the enforcement of a generally applicable law "would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind . . . ." 494 U.S. at 888.

Courts look to pre-*Smith* free exercise jurisprudence when assessing RFRA claims. *See Hobby Lobby*, 134 S. Ct. at 2772. The Supreme Court has characterized RFRA as "adopt[ing] a statutory rule comparable to the constitutional rule rejected in *Smith*." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). RFRA may be applied to situations not previously addressed under pre-*Smith* jurisprudence. *See Hobby Lobby*, 134 S. Ct. at 2772 ("It is simply not possible to read these provisions as restricting the concept of the 'exercise of religion' to those practices specifically addressed in our pre-*Smith* decisions.").

## 1. Legal Standard

Religious exercise is impermissibly burdened when government action compels individuals "to perform acts *undeniably* at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218 (emphasis added). Accordingly:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious

belief, thereby putting *substantial* pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.

*Thomas v. Review Bd.*, 450 U.S. 707, 717–18 (1981) (emphasis added). This Court has found "a substantial burden exists where: 1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available . . . versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the [G]overnment puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Mack v. Warden Loretto FCI*, 839 F.3d 286, 304 (3d Cir. 2016).

Important principles circumscribe the RFRA inquiry, and it is for the reviewing court to determine whether a burden is "substantial." We thus reiterate a self-evident principle that we set forth in *Geneva*: "While the Supreme Court reinforced in *Hobby Lobby* that we should defer to the *reasonableness* of the [RFRA claimant's] religious beliefs, this does not bar our objective evaluation of the *nature* of the claimed burden and the *substantiality* of that burden on the [claimant's] religious exercise."[18] 778 F.3d at 436 (emphasis

[18] Although our judgment in *Geneva* was vacated by the Supreme Court, it nonetheless sets forth the view of our Court, which was based on Supreme Court precedent, that we continue to believe to be correct regarding our duty to assess substantiality as well as our conclusion that the regulation at issue there did not impose a substantial burden. *Cf. Zubik*, 136 S. Ct. at 1560 (specifying that vacatur and remand do not

36

added). As such, "[w]hether a burden is 'substantial' under RFRA is a question of law, not a question of fact." *Id.* at 442 (citing *Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011)); *see also Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008) ("Accepting as true the factual allegations that [plaintiff's] beliefs are sincere and of a religious nature— but not the legal conclusion, cast as a factual allegation, that his religious exercise is substantially burdened . . . ."); *cf. Hobby Lobby*, 134 S. Ct. at 2775 ("Because RFRA applies in these cases, we must next ask whether the HHS contraceptive mandate 'substantially burden[s]' the exercise of religion.") (citing 42 U.S.C. § 2000bb-1(a)) (alteration in original)).

RFRA's legislative history underscores the requirement that the burden be substantial. The version of RFRA initially introduced in the House of Representatives

express the Supreme Court's "view on the merits" of *Geneva*). That judgment, and others cited here that addressed similar claims, was vacated because the Supreme Court wanted the parties to attempt—after the parties signaled they might be able—to develop a way for existing or modified ACA regulations to provide continued contraceptive coverage to petitioners' employees and through petitioners' insurers without any notice from petitioners. *Id.* Thus, *Zubik* vacated our judgment in *Geneva* but did not attack our reasoning. The Dissent mischaracterizes our holding today to be saying that *Geneva* is "controlling" for purposes of this case. Dissent Op. at 18. That is not our position. While *Geneva* is no longer controlling, there is nothing that would require us— or anyone else—to conclude that our reasoning in that opinion was incorrect.

37

provided only that "Government shall not burden a person's exercise of religion" unless the burden satisfied strict scrutiny. H.R. 1308, 103d Cong. § 3 (1993). It was only later in the enactment process that it was modified to include the word "substantially" immediately before "burden." 42 U.S.C. § 2000bb-1(a)–(b); *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1176 (10th Cir. 2015) ("Congress added the word 'substantially' before passage to clarify that only some burdens would violate the act. 139 Cong. Rec. S14352 (daily ed. Oct. 26, 1993) (statements of Sen. Kennedy and Sen. Hatch). . . . If plaintiffs could assert and establish that a burden is 'substantial' without any possibility of judicial scrutiny, the word 'substantial' would become wholly devoid of independent meaning."), *vacated and remanded sub nom. Zubik*, 136 S. Ct. at 1561. This important change made it explicit that RFRA would provide relief only from "substantial" government burdens on religious exercise, not from all government burdens.[19] The

---

[19] *See also* Matthew A. Melone, *Corporations and Religious Freedom:* Hobby Lobby Stores—*A Missed Opportunity to Reconcile a Flawed Law with a Flawed Health Care System*, 48 Ind. L. Rev. 461, 502–03 (2015) ("[T]he lack of any principled limitation on the meaning of religious exercise should prompt the courts to examine whether any burden on such exercise is substantial. Otherwise, RFRA becomes anarchical. . . . The notion that the judiciary has no business questioning the substantiality of a burden in this context is illogical. The law imposes objective standards on beliefs in other contexts and appears to do so without inordinate difficulty. . . . Every person has the right to attach whatever religious meaning to act to an act their conscience demands. The law, however, should not be

Dissent would have us read "substantial" out of the statute, revert to a never-enacted version of RFRA, and supplant our charge to conduct judicial review of a RFRA claim with automatic deference to the claimant.[20]  We will not.[21]

---

hostage to the vagaries of the hypersensitive.") (footnotes omitted).

[20] For a persuasive discussion of the untenable consequences of the Real Alternatives Employees' and Dissent's theory of absolute deference to an allegation that a burden is substantial, see Brief of Baptist Joint Committee for Religious Liberty as Amicus Curiae in Support of Respondents 14–16, *Zubik v. Burwell*, 136 S. Ct. 1557 (2016) (Nos. 14-1418, 14-1453, 14-1505, 15-35, 15-105, 15-119, 15-191).

[21] The Dissent grounds its aversion to judicial review of substantiality in a Tenth Circuit dissent from the denial of en banc review in the *Little Sisters* case, and points to James Madison's critique of the "notion that a civil judge can be a competent Judge of Religious Truth" for support.  Dissent Op. at 42 (internal quotation marks omitted).  Madison's writings are indeed instructive, as our refusal today to permit a claimant's bare allegations to automatically render a burden "substantial" is embedded in Madison's Federalist No. 10: "No man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity.  With equal, nay with greater reason, a body of men are unfit to be both judges and parties at the same time."  The Federalist No. 10, 59 (James Madison).

There is no substantial burden if the governmental action does not coerce the individuals to violate their religious beliefs or deny them the "rights, benefits, and privileges enjoyed by other citizens"—even if "the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs." *Lyng*, 485 U.S. at 449. Nor can a party use RFRA to "require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Bowen*, 476 U.S. at 699. "Congress has required qualitative assessment of the merits of . . . RFRA claims." *Geneva*, 778 F.3d at 435. At the same time, we must be careful to conduct only a review into the substantiality of the religious burden and not to question the reasonableness of the religious belief itself. *See Hobby Lobby*, 134 S. Ct. at 2778 (RFRA does not permit courts to address "whether the religious belief asserted in a RFRA case is reasonable"). Courts are not to accept every allegation of substantial burden. To the contrary, RFRA's demand for judicial review has been recognized by the Supreme Court,[22] by this Court in *Geneva*, and by virtually all of our sister circuits, which have not hesitated to examine whether an alleged burden is sufficiently "substantial" under RFRA.[23]

---

[22] *See Bowen*, 476 U.S. at 700–01 n.6 ("[F]or the adjudication of a constitutional claim, the Constitution, rather than an individual's religion, must supply the frame of reference.").

[23] *See Little Sisters*, 794 F.3d at 1176–77 ("RFRA's statutory text and religious liberty case law demonstrate that courts—not plaintiffs—must determine if a law or policy *substantially* burdens religious exercise" and finding alleged

burden not "substantial.") (emphasis added); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 247 (D.C. Cir. 2014) ("Accepting the sincerity of plaintiffs' beliefs, however, does not relieve this Court of its responsibility to evaluate the substantiality of any burden on plaintiffs' religious exercise . . . ."), *vacated and remanded sub nom. Zubik*, 136 S. Ct. at 1561; *E. Tex. Baptist Univ. v. Burwell*, 793 F.3d 449, 456 (5th Cir. 2015) ("We begin and end our analysis with the substantial-burden prong. The plaintiffs must show that the challenged regulations substantially burden their religious exercise . . . ."), *vacated and remanded sub nom. Zubik*, 136 S. Ct. at 1561; *Korte v. Sebelius*, 735 F.3d 654, 683 (7th Cir. 2013) (characterizing impermissible questions about the "centrality of the religious practice to the adherent's faith" as distinct from the substantial burden inquiry, which "evaluates the coercive effect of the governmental pressure on the adherent's religious practice and steers well clear of deciding religious questions"); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc) (characterizing the "crux" of the RFRA case as determining whether the Government "impose[d] a 'substantial burden' on the exercise of the Plaintiffs' religion" and finding no substantial burden where Government sought to use artificial snow for skiing on a mountain sacred to Indian tribe claimant); *Branch Ministries v. Rossotti*, 211 F.3d 137, 142–43 (D.C. Cir. 2000) (directly assessing whether claimant's alleged religious burden was sufficiently substantial under RFRA and finding that it was not); *see generally infra* note 37. *But see Sharpe Holdings, Inc. v. U.S. Dep't of Health & Humans Servs.*, 801 F.3d 927, 939 (8th Cir. 2015) ("[O]ur narrow function . . . in [the RFRA] context . . . is to determine whether the line

Rather than confront this precedent, our dissenting colleague would prefer to ignore the import, even the existence, of the "substantial" qualifier in the RFRA test. The Dissent reduces our position to say that "[r]eligious beliefs are not being burdened in any meaningful sense, so people should just stop complaining." Dissent Op. at 2. But whether the alleged burden is "meaningful"—or, more accurately, "substantial"— is not a question that can be so easily dismissed with a reductionist turn of phrase. To the contrary, it is the very essence of a RFRA claim, the threshold inquiry posed to any individual attempting to bring a successful RFRA claim, and it is undoubtedly for the court to answer whether it has been satisfied.[24] Turning to the burden alleged by the Real Alternatives Employees, we will now do just that.

---

drawn reflects an honest conviction." (internal quotation marks omitted) (alteration and omission in original)), *vacated and remanded on other grounds sub nom. U.S. Dep't of Health & Human Servs. v. CNS Int'l Ministries*, 136 S. Ct. 2006 (2016).

[24] Urging that we are wrongly questioning the "validity," Dissent Op. at 10, and "legitimacy," *id.* at 16, of the Real Alternatives Employees' religious beliefs, the Dissent conflates our dual responsibilities in adjudicating a RFRA claim: *accepting* the sincerity of a RFRA claimant's religious belief and *deciding* whether the alleged burden is "substantial." *See Hobby Lobby*, 134 S. Ct. at 2778 (noting that the RFRA presents the question of "whether the [Contraceptive Mandate] imposes a substantial burden" on the claimant, and *not* "whether the religious belief asserted . . . is reasonable"); *Little Sisters*, 794 F.3d at 1176 ("[A]ccepting any burden alleged by Plaintiffs as 'substantial'

## 2. Analysis

RFRA centers on the intersection between the specific conduct in which the objector is forced to engage and his or her religious exercise, and that is where we begin our analysis. The Real Alternatives Employees characterize their purchase of insurance as somehow enabling the provision of contraceptives, thereby substantially burdening their religious exercise. They allege that their "sincerely held religious beliefs prohibit them from [(1)] *using*, [(2)] *supporting*, or otherwise [(3)] *advocating* the use of abortifacients, or [(4)] *participating* in a health insurance plan that covers such items for themselves or their families." J.A. 123 (emphasis added). We address each enumerated allegation in turn, and we conclude that the Real Alternatives Employees have failed to demonstrate that the Contraceptive Mandate forces them to violate their religious beliefs.

The act complained of is the signing on to coverage followed by the request for reimbursement of services chosen. That basic scheme is the same for any individual whose employer provides him or her with insurance: The plan deems the employee eligible to be reimbursed for hundreds of different services, and that employee can take advantage of that eligibility as he or she sees fit. Should the employee opt to use a particular service, he or she fills out a form and asks to be paid back for costs incurred. In the end, the employee uses a covered service, or not; either way, there is no

---

would improperly conflate the determination that a religious belief is sincerely held with the determination that a law or policy substantially burdens religious exercise.").

requirement to support or advocate for whatever service he or she, or others, selects. Checking off a box to be eligible for reimbursement of services—services of the employee's choosing—in no way indicates, let alone suggests, support or advocacy for that service. The disconnect between the use of any one service and the use of contraceptives is arguably even greater—and it calls into question the "substantiality" of the purported burden. After all, a substantial burden on the exercise of religion exists only where the Government "demands that [an individual] *engage* in conduct that seriously violates [his or her] religious beliefs," *Hobby Lobby*, 134 S. Ct. at 2775 (emphasis added), and such engagement, as discussed in the following sections, is clearly lacking here.

We are then left with the fourth proscribed conduct that is central to the RFRA claim: participation. As with their equal protection claim, the Real Alternatives Employees rely primarily on *March for Life* for key support, as the district court there reasoned that "participating in" a health insurance plan, by its very nature, effects a substantial change in behavior because "health insurance does not exist independently of the people who purchase it." 128 F. Supp. 3d at 129. There, the district court found that, "[g]iven the nature of health insurance, [employees] *do* play a role in the health care plans that provide contraceptive coverage." *Id*. While characterizing what employees do by subscribing to a plan as "playing a role," *March for Life* would have us position this fact pattern in lockstep with *Hobby Lobby*. But do employees really "play a role?" The Real Alternatives Employees, along with the Dissent, assume the affirmative, relying on *March for Life*'s treatment of the concepts "buy

44

into" and "participate in" as interchangeable. But they are not.

Subscribing to an insurance plan involves no real "participation," just as there is no active "participation" when subscribing to a magazine or joining AARP or enrolling in a credit card that has membership benefits. These are all packages that involve a one-time enrollment, followed by essentially passive eligibility for certain services that the member opts in or out of. By declaring that an insurance plan does not exist without participants, the district court in *March for Life* somehow equates the plan with the employees as if they actively engage in a way that—were it factual—might be objectionable. Let us be clear: There is no "participation" in the real sense of the word. The employee pays for coverage and thereby avails him or herself of the ability to be reimbursed for services. But payment for the ability to have coverage does not give an employee an active "role" in the underlying plan. The insurance company offers a package of health benefits, including certain benefits mandated by the Government. The plan does not assure the availability of specific services. Those services are for the employee to seek out and use—or not. And the employee, by merely subscribing to that plan in the first instance, is even less directly related to whatever specific services he or she, or anyone else, might or might not use later on.[25] The

---

[25] One could analogize that a bank does not "exist independently" of its individual accountholders, whose money the bank lends at interest in order to earn profit. But the accountholders have no say in lending decisions (what rates to charge, which borrowers to lend to) and no direct control over the bank. They, like a subscriber to an insurance

45

employees' actions under the ACA are mediated by the insurance company, and any link between the decision to sign up for insurance on the one hand and the provision of contraceptives to a particular individual on the other is "far too attenuated to rank as substantial." *Hobby Lobby*, 134 S. Ct. at 2798–99 (Ginsburg, J. dissenting).

This attenuation is fatal to the RFRA claim. Cases finding a substantial burden under RFRA have consistently done so where, unlike here, there is a burden that interfered with the claimants' exercise and religion is directly implicated by federal action. *See Hobby Lobby*, 134 S. Ct. at 2751 (provision required employer-plaintiffs to provide

plan, are offered a panoply of services that are predeterminately attached to whichever account (or plan) they choose. Some are desirable to the accountholder and some are not. Assume that the individual's bank account is mandated by the Government under a privatized Social Security regime, for example. If an accountholder had a religious objection to the bank's practices—lending money at interest—we do not see how that accountholder could successfully vindicate his or her religious beliefs through RFRA. So too in the context of health insurance, every participant pays a premium so that the health insurer will provide coverage, and every participant also receives (some of) the benefits of that coverage as they so choose. But paying a premium simply is not equivalent to active participation—at a minimum, the insured employee has no say in what benefits the insurance company will offer or to whom—and "playing a role," however important to the plan's existence, does not automatically translate into experiencing a burden, let alone a substantial one.

contraceptive coverage in any group plan that they provided to their employees); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 527–28 (1993) (ordinance prohibited plaintiffs from sacrificing animals); *Lee*, 455 U.S. at 254 (statute required plaintiffs to pay Social Security taxes); *Thomas*, 450 U.S. at 712 (law denied plaintiff unemployment benefits); *Sherbert*, 374 U.S. at 399–400 (same); *Yoder*, 406 U.S. at 207 (law required plaintiffs to send their children to school); *see also Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761 (7th Cir. 2003), (holding, in the context of RLUIPA, that "a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable"), *reh'g en banc denied*; *cf. Fernandez v. Mukasey*, 520 F.3d 965, 966 (9th Cir. 2008) (per curiam) ("Petitioners have failed to establish that the [statutory provision at issue] places a substantial burden on their religious exercise under RFRA. . . . [T]he connection between [the statutory requirement and their religious exercise] is too attenuated to create a substantial burden on petitioners' religious exercise.") (footnote omitted).

These cases underscore that the connection between the conduct and the religious belief matters,[26] for "the law

_____

[26] While the Dissent urges that whether a burden is direct or indirect is no matter, even *March for Life* intimated otherwise. Adopting *Priests for Life*, the District Court in *March for Life* stated that "it is true that [a]n asserted burden is also not an actionable substantial burden when it falls on a third party, not the religious adherent." 128 F. Supp. 3d at 129 (alteration in original). It then reasoned: "Even though

distinguishes between direct participation and remote facilitation, treating the former as compelling and the latter as negligible."[27] Amy J. Sepinwall, *Conscience and Complicity: Assessing Pleas for Religious Exemptions in* Hobby Lobby*'s Wake*, 82 U. CHI. L. REV. 1897, 1938 (2015). The Government is not mandating an endorsement, or preventing someone from sacrificing an animal as part of a religious ritual, or anything of that nature. The Contraceptive Mandate increases the number of choices an employee has when he or she purchases health insurance—in this case, broadening the availability of services that an employee might or might not access. But that is all it is: a choice. It is still up to the employee to decide what to do with those options, to seek out relevant providers, to submit claims for reimbursement for the service he or she selects, and so on. The act complained of—the filling out of a form that triggers eligibility for reimbursement for services the employee chooses to use (or not)—has not changed, and it in no way amounts to the sort of "substantial" burden consistently found contrary to

the plaintiffs are not the direct objects of the Mandate, they are [] very much burdened by it." *Id.* By its own logic, *March for Life* acknowledged that directness matters in assessing whether there is an "actionable substantial burden," but then found a different means (by erroneously focusing on participation) of concluding that plaintiffs were nonetheless "very much burdened."

[27] *See also* Elizabeth Sepper, *Substantiating the Burdens of Compliance*, 2016 U. ILL. L. REV. ONLINE 53, 68 (noting that courts in multiple areas of law, including criminal law and torts, "evaluate[] burdens along a scale between directness and attenuation").

RFRA.[28]  And the possibility that *others* might avail themselves of services that the employees find objectionable is no more burdensome than filling out the form in *Geneva*.[29]

---

[28] This point is particularly relevant in light of the Real Alternatives Employees' allegation that the Contraceptive Mandate "fundamentally chang[es] the compensation package that can be offered to the individual employees." J.A. 123. That change, fundamental or not, still does not alter the nature of the conduct that the employees engage in when signing up for, or submitting a claim for reimbursement under, an insurance plan.

[29] The Dissent criticizes our consideration of how directly the burden affects the religious exercise and highlights the Supreme Court's statement in *Lyng* that "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment." Dissent Op. at 26 (citing 485 U.S. at 450). But the Dissent ignores the remainder of that paragraph, which specifically warns against implying from that observation that "incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require [G]overnment to bring forward a compelling justification for its otherwise lawful actions." 485 U.S. at 450–51. Subsequent appellate courts applying *Lyng* have heeded that advice. *Cf. Klem*, 497 F.3d at 279 (Lyng did not "hold that its conclusion must be read to mean that *any* incidental effect of a government program which may have *some* tendency to coerce individuals into acting contrary to their religious beliefs satisfies the substantial burden standard.").

Unlike in *Hobby Lobby*, which literally required the objecting employers to "arrange for" contraceptive coverage in a way that effectively amounted to sponsorship, 134 S. Ct. at 2775, the Contraceptive Mandate requires nothing of the employees that implicates their religious beliefs as stated. There is a material difference between employers arranging or providing

---

The Dissent further aims to supplement its mistaken view of "substantial burden" by couching it in the context of the recent Supreme Court case *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (June 26, 2017), pointing to that decision as demonstrative of the idea that "laws that coerce religious claimants to disavow their religion in order to receive a government benefit[] are inconsistent with our constitutional traditions." Dissent Op. at 34. But *Trinity Lutheran* has no real bearing on the specific question before us today. As our dissenting colleague implicitly recognizes, *Trinity Lutheran* is not a RFRA case. It dealt with a church's constitutional challenge to a state program that automatically denied grants to any applicant owned or controlled by a religious entity. 137 S. Ct. at 2017. "[T]he [state program's] policy put[] Trinity Lutheran to a choice: It may participate in an otherwise available benefit program or remain a religious institution." *Id.* at 2021–22. The question before the Supreme Court addressed only the treatment of an institution based on its religious status, not the effect of a federal program on individual religious beliefs. Signaling its intent to confine its holding to the particular facts and issue before it, the opinion noted: "This case involves express discrimination based on religious identity with respect to playground resurfacing. We do not address religious uses of funding or other forms of discrimination." *Id.* at 2024 n.3.

an insurance plan that includes contraception coverage—so that employees can avail themselves of that benefit—and becoming eligible to apply for reimbursement for a service of one's choosing.[30]

---

[30] By contrast, "[t]he religious costs at issue in *Hobby Lobby* were generated by the owners' *direct* participation in the purportedly wrong act—arranging and paying for the coverage of emergency contraception that they knew would be used by at least some employees and beneficiaries of their health plan. While one might have argued, as Justice Ginsburg did, that the independent decisions of employees and beneficiaries to use contraception were something like 'intervening causes' which cut off the owners' responsibility, it is also reasonable to conclude that those third-party decisions are insufficient to terminate responsibility when owners' *themselves* are required to arrange and (partially) pay for coverage of the objectionable contraceptives." Frederick Mark Gedicks, *"Substantial" Burdens: How Courts May (and Why They Must) Judge Burdens on Religion Under RFRA*, 85 GEO. WASH. L. REV. 94, 147 (2017) (footnotes omitted) (first emphasis added); *see also Geneva*, 778 F.3d at 436–37 ("The issue of whether there is an actual burden was easily resolved in *Hobby Lobby*, since there was little doubt that the actual *provision* of services did not render the plaintiffs 'complicit.' And in *Hobby Lobby*, the Court came to its conclusion that, *without any accommodation*, the contraceptive coverage requirement imposed a substantial burden on the religious exercise of the for-profit corporations, because those plaintiffs were required to either *provide* health insurance that included contraceptive coverage, in violation of their religious beliefs, or pay substantial fines.") (final emphasis added). The contrast with this case, which the

The Real Alternatives Employees ultimately fail to grasp that one size does not fit all:  The fact that the Government may require insurers to offer coverage for expenditures for certain services that *some* might find objectionable on religious grounds cannot form the basis of requiring the Government to adjust its programs on behalf of *all* employees.  The categories of services that could offend religious beliefs is wide-ranging and, as discussed *infra*, denying reimbursement for such services to *all* on the basis of the religious objections of *some* would be neither desirable nor administrable.  It is certainly not mandated under RFRA, which has long protected against *substantial*, usually *direct*, burdens on the individual bringing the claim, not those utterly disconnected from the claimants themselves.

In fact, the only behavior that the Contraceptive Mandate governs is the behavior of a third party, the insurer.  And as Amici Curiae rightly note, RFRA does not afford the Real Alternatives Employees a "religious veto over governmental action that affects them only incidentally and does not coerce them to violate their faith."  Amici Curiae Br. at 24.  This principle, that a RFRA claimant show that a penalty or benefit be more than incidental in order to amount to a *substantial* injury, is well-rooted in RFRA jurisprudence.  In *Lyng*, the Supreme Court rejected the RFRA claimants'

---

Dissent fails to reconcile, is abundantly clear:  Whereas an employer fashioning a plan for employees and offering it to them might arguably signal approval of that plan and its contents, the employee's act of signing up for a pre-defined health insurance plan that provides reimbursement for services that include contraceptive services does not.

52

free exercise claim because the injury only amounted to an incidental effect. 485 U.S. at 453. The Court held that the indirect burden cases "cannot imply that incidental effects of government programs, which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs, require [G]overnment to bring forward a compelling justification for its otherwise lawful actions." *Id.* at 450–51. As discussed at length *supra*, in passing RFRA, Congress bolstered *Lyng*'s reading of the Free Exercise Clause with RFRA's text[31] and legislative history.[32] We incorporated this logic in *Geneva*, finding that "free exercise jurisprudence instructs that we are to examine the act the [claimants] must perform—not the effect of that act—to see if it burdens substantially the [claimants] religious exercise," 778 F.3d at 440, and we reinforce that conclusion today.[33]

---

[31] 42 U.S.C. § 2000bb-1 ("Government shall not *substantially* burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.") (emphasis added).

[32] S. Rep. 103-111, 9 (1993) ("The act thus would not require such a justification for every government action that may have some incidental effect on religious institutions.").

[33] Other courts have come to similar conclusions in various contexts. *Newdow v. Peterson*, 753 F.3d 105, 109–10 (2d Cir. 2014) (holding that a currency's slogan did not substantially burden the plaintiff's free exercise rights); *United States v. Friday*, 525 F.3d 938, 947 (10th Cir. 2008) (holding that requiring some to receive a permit before engaging in a religiously mandated activity did not substantially burden their free exercise rights); *Henderson v.*

*Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001) (holding that a law did not substantially burden people's free exercise rights by preventing them from distributing religious shirts on the National Mall because they "can still distribute t-shirts for free on the Mall, or sell them on streets surrounding the Mall"); *Goodall by Goodall v. Stafford Cty. Sch. Bd.*, 60 F.3d 168, 172–73 (4th Cir. 1995) ("We find that the financial burden which the [RFRA claimants] must bear in order to provide [their son] with a cued speech interpreter at his private sectarian school does not constitute a substantial burden under RFRA."); *Smith by Smith v. Bd. of Educ.*, 844 F.2d 90, 94 (2d Cir. 1988) (holding that a school did not substantially burden a student's free exercise rights by holding graduation on the Sabbath); *Azeez v. Fairman*, 795 F.2d 1296, 1300 (7th Cir. 1986) (holding that an administrative name change procedure did not substantially burden a prisoner's free exercise rights); *Friedman v. Bd. of Cty. Comm'rs*, 781 F.2d 777, 791 (10th Cir. 1985) (holding that a county seal did not substantially burden the plaintiff's free exercise of religion); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc., v. City of Lakewood*, 699 F.2d 303, 307–08 (6th Cir. 1983) (finding that a local ordinance did not substantially burden a church's free exercise rights by preventing the church from constructing a new church in just ten percent of a city); *Walsh v. Louisiana High Sch. Athletic Ass'n*, 616 F.2d 152, 158 (5th Cir. 1980) (finding that an interscholastic athletic rule did not substantially burden the plaintiff's free exercise rights by preventing him from competing in interscholastic high school sports for a year after a transfer); *Berman v. Bd. of Elections*, 420 F.2d 684, 686 (2d Cir. 1969) (holding, in the alternative, that the Government did not substantially burden a voter's free

RFRA precedent further instructs that the Real Alternatives Employees' requested remedy, lifting a penalty imposed on a third party—the insurer—would run afoul of this Court's and others' findings that individuals cannot use RFRA to compel the Government to structure its relations with a third party in a certain way. "The Supreme Court has consistently rejected the argument that an independent obligation on a third party can impose a substantial burden on the exercise of religion in violation of RFRA . . . ." *Geneva*, 778 F.3d at 440–41 (outlining cases); *see also Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 710 (1985) (recognizing as "a fundamental principle of the Religious Clauses" that "[t]he First Amendment . . . gives no one the right to insist that in pursuit of their own interests others must conform their conduct to his own religious necessities") (omission in original) (internal quotation marks omitted); *E. Texas Baptist Univ. v. Burwell*, 793 F.3d 449, 459 (5th Cir. 2015) ("RFRA confers no right to challenge the independent conduct of third parties . . . ."), *vacated and remanded sub nom. Zubik*, 136 S. Ct. at 1561; *Priests for Life*, 772 F.3d at 246 ("[N]o RFRA right to be free from the unease, or even anguish, of knowing that third parties are legally privileged or obligated to act in ways their religion abhors."); *Ave Maria Found. v. Sebelius*, 991 F. Supp. 2d. 957, 965–66 (E.D. Mich. 2014) ("[A] great number of religious objections based on third-party actions are dismissed simply because the plaintiff is not pressured to act in any way.") (citing cases).

---

exercise rights when it accommodated his religious opposition to voting in a church by allowing him to change voting districts and vote by absentee ballot).

Before we end our discussion of the "substantial burden" inquiry under RFRA, we note that while the Dissent would downplay the workability concerns exposed by the District Court regarding the ramifications of finding a substantial burden here, we believe they are real. As one Seventh Circuit Court of Appeals jurist observed, "contraceptive care is by no means the sole form of health care that implicates religious concerns." J.A. 66 (citing *Grote v. Sebelius*, 708 F.3d 850, 866 (7th Cir. 2013) (Rovner, J., dissenting)). Medical treatments that some might view as objectionable are as varied as they are numerous. Examples that are by no means exhaustive include artificial insemination and other reproductive technologies; genetic screening and counseling; preventative and remedial treatment for sexually transmitted diseases; sex reassignment; vaccination; organ transplant from deceased donors; blood transfusions; euthanasia or physician-assisted suicide; and so on. *See id.* (noting that "in some religions, virtually all conventional medical treatments[] are objectionable"). By extension, "[a] finding that coverage for one set of objectionable services constitutes a substantial burden would imply that coverage for all such services imposes a substantial burden"—an implication that would "render the health care system totally unworkable." *Id.*; *see also Navajo Nation*, 535 F.3d at 1072 ("[G]overnment simply could not operate if it were required to satisfy every citizen's religious needs and desires.").

The Dissent parrots *March for Life*'s dismissal of these workability concerns, pointing to the incentives of insurance companies as safeguards against "a world in which the [G]overnment would require third-party insurance companies to provide coverage in every possible form requested by an

individual on religious grounds."[34] *March for Life*, 128 F. Supp. 3d at 132; *see also* Dissent Op. at 35–39. But the incentives argument is off-point and not curative of our concerns. The Dissent transplants *March for Life*'s discussion of insurance companies' incentives—reviewed there in the context of deciding whether the Government satisfied the *third* "least restrictive" prong of the RFRA analysis—into its analysis of the *first* "substantial burden" prong. And even if insurance companies' incentives were relevant, they would still not satisfy our concerns. The district court's presumption in *March for Life*, the backbone of the Dissent's rebuttal here, is that "[i]insurance companies have every incentive to maintain a sustainable and functioning market . . . ." Dissent Op. at 37–38 (alteration in original) (quoting 128 F. Supp. 3d at 132). This is a false premise: Insurance companies have an interest in a sustainable and functioning insurance market only to the extent that it is profitable for them.[35] Nor is the identification

---

[34] *Gonzales*, the only other case that the Dissent cites to address workability, said nothing about our concerns regarding the end-run on legislation that a ruling in favor of the Real Alternatives Employees would unleash. *See* Dissent Op. at 35–36 (citing *Gonzales*, 546 U.S. at 436).

[35] The Dissent would prefer that "we leave to the insurance companies themselves the decision of what coverage options they can profitably provide." Dissent Op. at 39. By the Dissent's logic, any regulation of any market is unnecessary because sellers in any market presumably have some interest in keeping that market functioning. Why require car manufacturers to provide seatbelts if market demands will necessitate them anyway? It is entirely within

of an insurance company that is allegedly willing to provide a satisfactory plan relevant to our analysis. The RFRA test does not ask whether a claimant is able to offset a purported burden with an alternative scheme of his or her choosing, and neither the Real Alternatives Employees nor the Dissent have pointed to any case indicating otherwise.[36]

Our inquiry today urges an examination of the claimed substantial nature of an alleged burden. This approach contrasts sharply with that of the district court in *March for Life*, which assumed—without any analysis whatsoever—the "substantial" nature of the so-called burden of "participating" in an insurance plan. *Id*. at 129–30. Yet we arguably need not even address the issue of whether the employee's choice is coercive when the so-called burden of signing up for coverage that might enable themselves or others to be reimbursed for various services is clearly not substantial. No matter how sincerely held their beliefs may be, we cannot accept at face value that subscribing to the plan imposes a "*substantial* burden." Surely the word "substantial" is a matter of subjectivity, not as to genuineness of belief but as to the nature and extent to which religious exercise is hampered or restrained by the conduct in question. It is, after all, an imperative safeguard, else religious beliefs would invariably trump government action.

---

the legislature's prerogative to regulate an industry regardless of whether that industry may otherwise and on its own impose similar regulations.

[36] The existence of an alternative plan is only relevant to standing and questions of redressability.

In characterizing the facts in an inaccurate manner, sidestepping the statutory text, legislative history, and controlling case law entirely, the Real Alternatives Employees urge us to put an active gloss on what is essentially a passive commercial monetary decision: enrolling in a plan so as to be reimbursed for services of which one later chooses to avail him or herself. Viewing the situation for what it is compels us to conclude that whatever burden there might be, it is certainly not substantial.

Because we conclude that the Real Alternatives Employees have not—and cannot—show that the Contraceptive Mandate imposes a substantial burden on their religious beliefs, we need not reach the question of whether the Contraceptive Mandate is the least restrictive means of furthering a compelling governmental interest.[37]

### III.  CONCLUSION

For the foregoing reasons, we will affirm the District Court's order denying Appellants' motion for summary

---

[37] We note that the Dissent's assertion that "[t]ime and again courts have rejected the regulation because it is not the least restrictive means of achieving its objective," Dissent Op. at 4, is simply wrong, for only one case in addition to *March for Life* has addressed the precise question before us today. That case, *Wieland v. United States Department of Health and Human Services*, 196 F. Supp. 3d 1010 (E.D. Mo. 2016), essentially adopted the reasoning of *March for Life* in finding for the RFRA claimants and did not perform a meaningfully distinct analysis.

judgment in its entirety and granting the Government's cross-motion for summary judgment in its entirety.

*Real Alternatives, et. al. v. Burwell, et al.*, No. 16-1275
JORDAN, *Circuit Judge*, concurring in part in the judgment and dissenting in part.

Not so long ago, the idea of making nuns sign government documents they believe would involve them in grievous sins relating to life and death, or forcing devout Mennonites to pay for health insurance coverage for drugs and devices they view as abortifacients, would probably have been unthinkable in this country. Then came the Patient Protection and Affordable Care Act, known variously as Obamacare, or the Affordable Care Act, or the ACA. It has trailed in its wake a number of highly contentious lawsuits but none more intensely fought than the ones in which the government has sought to sweep aside the religious objections of individuals and organizations opposed to the portion of the ACA called the "Contraceptive Mandate." That feature of the statute, which requires non-grandfathered group health care plans to include coverage for certain controversial contraceptive items, was at the center of the aforementioned disputes involving the nuns and the Mennonites. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); *Little Sisters of the Poor Home for the Aged v. Burwell*, 794 F.3d 1151, 1168 (10th Cir.), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016). And it is here for a return engagement in this case.

Having been beaten back in earlier efforts to force the Contraceptive Mandate on the populace, the government has changed its tune a bit – it has come up with a new rationale for its erratically aggressive enforcement of that feature of the ACA – but the song it sings is essentially the same: individuals whose faith prompts sincere opposition to paying

1

for or facilitating the purchase of contraceptives cannot be heard to object; the only thing legitimately at issue is the regulation of insurance markets. According to the government, the Mandate has nothing to do with deep questions about the beginning of life, or the boundaries of moral culpability, or about faith and one's obligations to God. Religious beliefs are not being burdened in any meaningful sense, so people should just stop complaining. That is the line pressed by the United States Department of Justice, and it is the line accepted by my colleagues in the Majority, but I reject it.

Even if this case could properly be characterized as nothing more than an examination of insurance markets, though, I could not agree with my friends in the Majority on the central point of the dispute. They believe that citizens who buy health insurance are ciphers, that they do not have any "'participation' in the real sense of the word" when it comes to the coverage they sign up and pay for, and therefore the answer to the question "do employees really 'play a role'" in the market for health care services is, according to my colleagues, a resounding no. (Maj. Op. at 45.) I disagree. After the federal government gave itself a vastly greater role in the health insurance market, there has no doubt been less room for decision making by individual purchasers. But that does not mean that people were not meaningfully participating in the market before. There were plans available that employers were free to sponsor, and employees were free to seek, that did not require payment for contraceptive coverage. And there are still, as this record demonstrates, insurers who are ready, willing, and able to provide such plans again, if the government did not forbid it. So, while it is true that individual choice has been drastically reduced by

2

the federal government, that subtraction of freedom cannot be a reason to say that government coercion of payment for unwanted contraceptive products – indeed, to some people, morally abhorrent products – is no burden on individuals. The circularity of the government's and the Majority's reasoning is stark.

I do not disagree with every aspect of my colleagues' decision. The portion of the judgment that deals with the Equal Protection and Administrative Procedures Act claims of Real Alternatives, Inc. is sound.[1] I write separately, however, to specify my disagreements with the Majority's treatment of the Religious Freedom Restoration Act ("RFRA") claim brought by Real Alternatives' employees Kevin I. Bagatta, Thomas A. Lang, and Clifford W. McKeown (the "Individual Plaintiffs"). In my view, the Individual Plaintiffs have adequately pled and provided sufficient evidence to demonstrate that the Contraceptive Mandate is a substantial burden on their free exercise of religion.[2]

---

[1] I do not agree in full with the reasoning the Majority employs for the APA claim, *see infra* footnote 4, but I do agree that precedent requires the result.

[2] In the District Court, the government asked either for dismissal or summary judgment. The District Court accepted and perpetuated that ambivalence, granting the government's motion to dismiss or in the alternative for summary judgment. The Majority Opinion treats the District Court opinion as solely granting summary judgment to the government. As I see it, the government does not win either way; it loses either way. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To

Having reached that conclusion, I confront the question that the Majority avoids: whether the Contraceptive Mandate is narrowly tailored to support a compelling government interest. The answer is no. Time and again courts have rejected the regulation because it is not the least restrictive means of achieving its objective. There are several other options the government could have chosen to enforce its regulation without impinging on the rights of religiously devout individuals. For that reason, I respectfully dissent.

## I.    Background

The Individual Plaintiffs are full-time employees of Real Alternatives,[3] a non-profit organization devoted solely "to promoting alternatives to abortion." (Opening Br. at 2.) All three men, their wives, and collectively seven minor children, are covered by Real Alternatives' health insurance plan.

---

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); Fed. R. Civ. P. 56 ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). The Individual Plaintiffs' RFRA claim should survive.

[3] Bagatta serves as the President of Real Alternatives, Lang is the Vice President of Operations, and McKeown is the Vice President of Administration.

4

In addition to dedicating their professional lives to preventing abortion, the Individual Plaintiffs hold religious beliefs that honor life from conception. It is undisputed that all three men are devout in their respective religious faiths – Bagatta and Lang are Catholics, and McKeown is an Evangelical Christian. Among their sincerely held convictions, "[e]ach of the employees and their families believe that all human lives have full human dignity from the moment of conception/fertilization." (JA 99.) That is the baseline, undisputed factual background upon which we are obligated to proceed. The Individual Plaintiffs' belief that life begins at conception entails the further belief "that they are prohibited from using, supporting, or otherwise advocating abortifacient drugs and devices, including IUD and any hormonal birth control method … ." (JA 99.)

The Contraceptive Mandate, promulgated under the ACA, requires non-grandfathered group health care plans to include coverage for the full range of FDA-approved contraceptive methods, which encompasses diaphragms, oral contraceptives, intrauterine devices, and drugs such as "Plan B" and "Ella."[4] (JA 6.) The latter two are sometimes called,

---

[4] Grandfathered plans are defined as those that existed prior to March 23, 2010. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2764 (2014) (citing 42 U.S.C. §§ 18011(a), (e)). They "need not comply with many of the [ACA's] requirements, including the [C]ontraceptive [M]andate." *Id.* As I indicated in dissent in *Conestoga Wood Specialties Corp. v. Secretary of United States Department of Health & Human Services*, 724 F.3d 377 (3d Cir. 2013) (Jordan, J., dissenting), *rev'd and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), the

5

Mandate and related regulations were "not the product of any legislative debate" or "even the result of work within an administrative agency." *Id.* at 391 n.2. They were drafted by the Institute of Medicine, a private entity that, as a result of the ACA's complicated scheme "has ended up dictating regulations that the government insists override[] the [Individual Plaintiffs'] rights to religious liberty." *Id.*

The Majority takes issue with whether the products and services covered by the Contraceptive Mandate include abortifacients. *See* (Maj. Op. at 31-32). While we may be bound to accept the Department of Health and Human Services' definition of "abortifacients" for purposes of APA review, *see Auer v. Robbins*, 519 U.S. 452, 461 (1997) (holding – not without controversy – that courts must defer to an agency's interpretation of its own ambiguous regulation so long as it is not "plainly erroneous or inconsistent with the regulation" (citation omitted)), that is not true when we are considering the burden imposed on the Individual Plaintiffs' exercise of their religious beliefs. The Individual Plaintiffs are persuaded that life begins at conception and that, by definition, a drug or device that prevents implantation of a fertilized ovum is an abortifacient. In other litigation, the government has admitted that some items covered by the Contraceptive Mandate can indeed prevent implantation. Brief of Respondent United States in Opposition to Cert., *Conestoga Wood Specialties Corp. v. Sebelius*, 2013 WL 5740267 at *10 n.5 (filed October 21, 2013) ("Plan B, an emergency contraceptive, is a pill that works mainly by stopping the release of an egg from the ovary but may also work by preventing fertilization of an egg or by preventing attachment (implantation) to the womb (uterus). … Ella, another emergency contraceptive, is a pill that works mainly

6

respectively, the "morning-after pill" and the "week-after pill." (*Id.*)

The Individual Plaintiffs currently elect to obtain their health insurance through their employer, Real Alternatives. Before the Mandate went into effect, Real Alternatives bought an insurance plan for its employees that did not contain contraceptive coverage. Because of the Contraceptive Mandate, that plan is no longer available. If the Individual Plaintiffs decide to decline coverage through their employer, the government requires them to obtain it in the open market, either independently or through "insurance exchanges," which are organizations created pursuant to the ACA to facilitate the purchase of health insurance. All the plans available on the open market – again because of the Contraceptive Mandate – contain coverage for the contraceptives.[5] In other words, the government has declared that the Individual Plaintiffs must buy health insurance and, simultaneously, has made it impossible for them to purchase any coverage that conforms to their religious beliefs.

Enforcement of the Contraceptive Mandate, however, is far from uniform. The government has granted a great

---

by stopping or delaying the ovaries from releasing an egg but may also work by changing the lining of the womb (uterus) that may prevent attachment (implantation)." (quotations and citation omitted)).

[5] According to the Verified Complaint, all available plans "will include all contraceptives, including abortifacients, and might also include surgical abortion." (JA 114.)

7

many exceptions.  *See Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 413 (3d Cir. 2013) (Jordan, J., dissenting), *rev'd and remanded sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ("By its own choice, the government has exempted an enormous number of employers from the Mandate, including 'religious employers' who appear to share the same religious objection as Conestoga and the Hahns, leaving tens of millions of employees and their families untouched by it.").  As the District Court observed, this scheme of sporadic application has spawned "dozens of lawsuits … challeng[ing] both the Contraceptive Mandate and the dimensions of its exemptions."  (JA 11.)  This is just the latest episode.

## II.    Discussion[6]

### A.    RFRA

RFRA was enacted "to provide very broad protection for religious liberty." *Hobby Lobby*, 134 S. Ct. at 2760. It was passed in the wake of the Supreme Court's decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), which upended

---

[6] As stated in the Majority Opinion, the District Court had jurisdiction and so do we. *See* (Maj. Op. at 15 n.5). The government conceded at oral argument that the Individual Plaintiffs have standing to challenge the Mandate. *See* http://www2.ca3.uscourts.gov/oralargument/audio/16-1275RealAlternativesInc,etalv.SecretaryDeptofHealthandHumanServices,etal..mp3, at 22:32 (argued November 3, 2016) (counsel for the government recognizing that there "probably was standing"). I agree. But for the Mandate, the Individual Plaintiffs would be able to purchase a health plan that does not include the contraceptives to which they object. *Cf. March for Life v. Burwell*, 128 F. Supp. 3d 116, 123 n.6 (D.D.C. 2015) ("At the request of the Court, plaintiffs submitted a letter received from March for Life's insurance carrier, CareFirst BlueCross BlueShield. The letter states that CareFirst would be willing to offer March for Life or its employees a plan omitting the contraceptive coverage that they are objecting to [i]f a legal exemption from [the Mandate] is obtained." (alteration in original) (citation omitted)). The Majority acknowledges this when they state that "[t]he existence of an alternative plan is … relevant to standing[.]" (Maj. Op. at 58. n.36.)

9

decades of precedent by "virtually eliminat[ing] the requirement that the government justify burdens on religious exercise." *Conestoga Wood*, 724 F.3d at 407 (Jordan, J., dissenting) (quoting 42 U.S.C. § 2000bb(a)(4)). RFRA was supported by an "extraordinary ecumenical coalition in the Congress[,]" *id.*, and has been hailed as "the most important congressional action with respect to religion since the First Congress proposed the First Amendment." *Id.* (quoting Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L. Rev. 209, 243 (1994)).[7]

Most importantly for present purposes, RFRA restored in religious liberty cases "the judicial standard of review known as 'strict scrutiny,' which is 'the most demanding test known to constitutional law.'" *Id.* at 408 (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)). According to RFRA, the government is generally forbidden to "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42

---

[7] The Majority focuses its telling of this history on *Smith*'s rejection of a test that allowed broad protection for religious liberty. *See* (Maj. Op. at 35 (quoting *Smith*, 494 U.S. at 888 for the proposition that a balancing test "would open the prospect of constitutionally required religion exemptions from civic obligations of almost every conceivable kind")). That misses the key point that RFRA was passed for the very purpose of overruling *Smith* to the fullest extent of Congress's power. *See* 42 U.S.C. § 2000bb(b) (declaring that the purpose of RFRA was "to restore the compelling interest test" from pre-*Smith* jurisprudence).

U.S.C. § 2000bb-1(a).  If the government does substantially burden an individual's exercise of religion, then that individual is entitled to an exemption from the government action, unless the government can show that the "application of the burden to the person-- (1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).  No one disputes that the strict scrutiny required by RFRA applies to the Contraceptive Mandate, if the Mandate substantially burdens religious belief and practice.[8]

## B.    Substantial Burden

The Majority says that the Individual Plaintiffs have not demonstrated a substantial burden on their religious beliefs, but my colleagues reach that conclusion by a route that amounts to questioning the validity of those beliefs – an indulgence that we are forbidden.  The Supreme Court has made it clear that, when applying RFRA and analyzing a burden on religion, our role is confined.  "[F]ederal courts have no business addressing … whether the religious belief asserted in a RFRA case is reasonable … ."  *Hobby Lobby*, 134 S. Ct. at 2778 (internal quotations omitted); *cf. Smith*,

---

[8] RFRA as passed by Congress also applied to the States, but, in *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), the Supreme Court held that the attempt to apply the statute to the States exceeded Congress's power under Section Five of the Fourteenth Amendment.  *See Hobby Lobby*, 134 S. Ct. at 2761 (discussing *City of Boerne*, 521 U.S. at 533-34.)

11

494 U.S. at 887 ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."); *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715 (1981) (recognizing that "it is not for us to say that the line [a religious observer] drew was an unreasonable one" and that courts cannot "dissect religious beliefs").  Instead of weighing the reasonableness of deeply-held religious convictions (and inevitably passing judgment on their value), we have a "narrow function."  *Hobby Lobby*, 134 S. Ct. at 2779.  We ask only "whether the line drawn [by the adherent] reflects an honest conviction."  *Id.*  (citation omitted).

Once we have determined that an adherent has an honest conviction, we ask if the government regulation imposes a substantial burden on adherence to that conviction.  In this instance, we must decide "whether the [Contraceptive] [M]andate imposes a substantial burden on the ability of the objecting parties to [live] in accordance with *their religious beliefs*[.]"  *Hobby Lobby*, 134 S. Ct. at 2778.  A "substantial burden" exists where: (1) "a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other [persons] versus abandoning one of the precepts of his religion in order to receive a benefit"; or (2) "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs."  *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007).

The Individual Plaintiffs attest in their Verified Complaint that paying for insurance coverage for

12

contraception violates their religious beliefs.[9] *See Verified Complaint* at ¶ 46 (JA 99-100) ("[T]he Real Alternatives employees and their families object, on the basis of their sincerely held ethical and religious beliefs, to participating in, and/or paying a portion of the premium for, a health insurance plan which provides coverage for objectionable items for themselves and their family members."). Because of the Contraceptive Mandate, they are faced with two choices: purchase a plan with the offending coverage (either through their employer or on the exchanges) or decline to purchase a plan, face a tax penalty, and leave their families uninsured. *See* 26 U.S.C. § 5000A (codifying the ACA's individual mandate which requires individuals without employer-coverage to purchase insurance or pay a penalty). Notwithstanding the Majority's protestations to the contrary, that is a prime example of a substantial burden on religion. It manages to satisfy both of the alternative tests for a substantial burden: a believer is forced to choose whether to follow the precepts of his religion and be penalized by the government, or to abandon his convictions,[10] *and* the

---

[9] A Verified Complaint is treated as an affidavit in the summary judgment posture. *See, e.g., Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating a verified complaint as an affidavit for purposes of summary judgment).

[10] Supreme Court jurisprudence demonstrates that the imposition of a government penalty is at least as onerous as the withholding of a government benefit. *See Hobby Lobby*, 134 S. Ct. at 2775 (noting that it had "little trouble concluding" that forcing plaintiffs to choose between honoring their religious convictions or facing severe economic penalties was a substantial burden).

"government [thus] puts substantial pressure on [the follower] to substantially modify his behavior and to violate his beliefs." *Washington*, 497 F.3d at 280.

The Supreme Court has long since declared that a Hobson's choice like the one forced upon the Individual Plaintiffs is indeed a substantial burden on the exercise of religion. *See Thomas*, 450 U.S. at 716 ("More tha[n] 30 years ago, the Court held that a person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program."). And that principle remains in full force today. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021-22 (2017) (finding a burden on religion under the Free Exercise clause where a state statute required a church to choose between "participat[ing] in an otherwise available benefit program or remain[ing] a religious institution"). It reflects an understanding that predates RFRA but rings throughout the statute. *See Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding a burden on a plaintiff where a state unemployment law "force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand"); *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972) (finding a substantial burden where a "Wisconsin [compulsory education] law affirmatively compel[led] [the plaintiffs] under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs"). The avoidance of such dilemmas is a key purpose of RFRA. *See* 42 U.S.C. § 2000bb(b) (stating that a purpose of RFRA is "to provide a claim or defense to persons whose religious exercise is substantially burdened by [the] government").

14

*Hobby Lobby* considered in depth whether the Contraceptive Mandate imposed a substantial burden on religiously devout persons who were being forced to make a choice very like the one at issue here.[11] 134 S. Ct. at 2775-77. In that case, "family-run businesses" whose owners had strongly-held religious beliefs against contraception were forced to face severe economic fines if they chose to honor their beliefs.[12] *Id.* The Supreme Court reasoned that

---

[11] The Majority asserts that my saying the decisions faced by the employers in *Hobby Lobby* and the employees here are similar "misstates the applicability of *Hobby Lobby*[.]" (Maj. Op. at 34 n.17.) Not so. The comparison is apt because the claimants in *Hobby Lobby* and the Individual Plaintiffs in this case were both forced by the United States to take nearly-identical action: purchase of and participation in a plan that covers a form of contraception that they believe is antithetical to the sanctity of life.

[12] The Supreme Court also rejected an argument made by the government that the plaintiffs could avoid the substantial burden by simply declining to provide health insurance to their employees. *See Hobby Lobby*, 134 S. Ct. at 2777 ("We doubt that the Congress that enacted RFRA – or, for that matter, ACA – would have believed it a tolerable result to put family-run businesses to the choice of violating their sincerely held religious beliefs or making all of their employees lose their existing healthcare plans."). Here, the burden is likewise substantial because the Individual Plaintiffs' only alternative to purchasing the offending insurance plans is to forego insurance and pay the associated penalty.

15

"[b]ecause the Contraceptive Mandate forces them to pay an enormous sum of money … if they insist on providing insurance coverage in accordance with their religious beliefs, the [M]andate clearly imposes a substantial burden on those beliefs."[13] *Id.* at 2779.

Two other courts have considered the precise question before us today: whether the Mandate imposes a substantial burden on the exercise of religious beliefs when individuals are required to purchase insurance coverage through their employer or on the open market, and all available plans (because of government action) are required to contain coverage at odds with those individuals' faith. Both courts held that the Contraceptive Mandate does, in that context, impose a substantial burden on the exercise of religion. In *March for Life v. Burwell*, 128 F. Supp. 3d 116, 130 (D.D.C. 2015), the court said "[e]mployee plaintiffs are … caught between the proverbial rock and a hard place: they can either buy into and participate in a health insurance plan that includes the coverage they find objectionable and thereby violate their religious beliefs, or they can forgo health insurance altogether and thereby subject themselves to penalties for violating the ACA's individual mandate." Similarly, in *Wieland v. United States Department of Health & Human Services*, 196 F. Supp. 3d 1010, 1017 (E.D. Mo.

---

[13] The immediate financial cost to the employees is less here, but not insignificant. *See* 26 U.S.C. § 5000A (imposing a penalty of the higher of either 2.5% of household income or $695/adult and $347.50/child, the latter capped at $2,085). Of course, that cost does not account for the very serious risk that must be absorbed if one is forced to go without health insurance.

2016), the court observed that the Mandate's "ultimate impact is that Plaintiffs must either maintain a health insurance plan that includes contraceptive coverage, in violation of their sincerely-held religious beliefs, or they can forgo healthcare altogether, which will result in the imposition of significant penalties (not to mention the potentially crippling costs of uninsured health care)."

The Majority here, though, sees things differently. It claims that the Contraceptive Mandate cannot possibly impose a substantial burden on anyone, relying on six general arguments to bolster that conclusion. Those reasons, however, look like nothing more than a rejection of where the Individual Plaintiffs' consciences have led them to draw the line against being complicit in what their religions tell them is wrong. It is the legitimacy of their conscientious religious objections that my colleagues call into question, contrary to the explicit direction of the Supreme Court. *See Hobby Lobby*, 134 S.Ct. at 2778 (refusing to delve into "difficult and important question[s] of religion and moral philosophy").

1. *The Precedential Effect of* Geneva College

First, the Majority relies on the now-vacated decision of our court in *Geneva College v. Secretary, United States Department of Health & Human Services*, 778 F.3d 422 (3d Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell,* 136 S. Ct. 1557 (2016), to emphasize that courts can, and should, assess the substantiality of a claimant's asserted burden. In that case, a panel considered the religious exemption to the Mandate and determined that requiring non-profit religious employers to register their objection to the

17

Contraceptive Mandate by filling out a form was not a substantial burden under RFRA. *See id.* at 442 ("Because we find that the self-certification procedure does not cause or trigger the provision of contraceptive coverage, appellees are unable to show that their religious exercise is burdened."). That opinion was deprived of any precedential effect by the Supreme Court's decision in *Zubik v. Burwell*, 136 S. Ct at 1561. Nevertheless, the Majority contends that *Geneva* is persuasive and was not vacated because it was incorrect. (Maj. Op. at 37 n.18.) I have my doubts about *Geneva*'s reasoning,[14] but no doubt that it is not controlling.[15]

---

[14] The opinion in *Geneva* reflects, I think, an admirable effort to explain why the form-filling exercise should not give the faithful concern that they are complicit in actions contrary to their religion. But there is a different and persuasive discussion in the dissent from the order denying rehearing en banc review in the Tenth Circuit in *Little Sisters of the Poor Home for the Aged v. Burwell*, 799 F.3d 1315, 1317 (10th Cir. 2015) (Hartz, J., dissenting) ("When a law demands that a person do something the person considers sinful, and the penalty for refusal is a large financial penalty, then the law imposes a substantial burden on that person's free exercise of religion. All the plaintiffs in this case sincerely believe that they will be violating God's law if they execute the documents required by the government. And the penalty for refusal to execute the documents may be in the millions of dollars. How can it be any clearer that the law substantially burdens the plaintiffs' free exercise of religion?").

[15] In claiming that I mischaracterize their argument, my colleagues agree that *Geneva* is not controlling and lacks precedential force. (Maj. Op. at 37 n.18.) ("*Geneva* is no

18

longer controlling[.]"). But the Majority claims that "*Zubik* vacated our judgment in *Geneva* but did not attack the reasoning" and suggests that the Supreme Court's vacatur has no impact on "the view of our Court" as set forth in that case. (*Id.*) It is inaccurate to claim that a vacatur has no effect on the strength of an opinion – indeed, we have repeatedly emphasized in our case law that, when an opinion is vacated, "it carries no precedential force." *1621 Route 22 W. Operating Co., LLC v. Nat'l Labor Relations Bd.*, 825 F.3d 128, 141 n.6 (3d Cir. 2016); *see also Leader v. Apex Hosiery Co.*, 108 F.2d 71, 81 (3d Cir. 1939) (holding that a decree considered to be vacated "is no longer binding as a precedent, as the law of the case, or as res judicata"). Other Circuits are in general agreement on this point. *See, e.g., Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 (9th Cir. 1991) (rejecting an argument that a decision still had precedential value because it was vacated on alternative grounds because while "[a] decision may be *reversed* on other grounds … a decision that has been *vacated* has no precedential authority whatsoever"). The Majority cites no case law for the extraordinary proposition that an appellate court's reasoning and judgment, after it has been vacated by the Supreme Court, should carry weight in future cases, especially when applied to litigants who were not parties to the original dispute.

*Geneva*'s holding was vacated after the Supreme Court received supplemental briefing indicating that the government and non-profit religious employers could potentially reach a compromise position that did not infringe on the rights of the latter. *See Zubik*, 136 S. Ct at 1560 ("Given the gravity of the dispute and the substantial clarification and refinement in the positions of the parties, the parties on remand should be

But even if *Geneva* were binding or persuasive precedent, it does not lead to the result the Majority reaches in this case. There are significant factual differences between the burdens alleged in *Geneva* and those at issue here. Notably, the panel in *Geneva* reasoned that the claimed burden – the requirement to fill out and file a form – was actually a means to register and affirm the employer's objection to providing contraceptive coverage. *See Geneva*, 778 F.3d at 438-39 ("If anything, because the appellees specifically state on the self-certification form that they *object* on religious grounds to providing such coverage, it is a declaration that they will *not be complicit* in providing coverage."). According to *Geneva*, filling out the form was, in effect, the organization's chance to "wash[] its hands of any involvement in contraceptive coverage[,]" leaving it to "the insurer and the third party administrator [to] tak[e] up the slack under compulsion of federal law." *Id.* at 441 (internal quotation omitted).[16] Here, the Individual Plaintiffs are

---

afforded an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans 'receive full and equal coverage, including contraceptive coverage.'" (citation omitted)). Thus, the Supreme Court did not in any way endorse the conclusion that the college did not face a substantial burden under RFRA. *See id.* ("[T]he Court does not decide whether petitioners' religious exercise has been substantially burdened … .")

[16] The response to that reasoning, of course, is that saying something does not make it so. If the government says "file this paperwork so that we can give abortifacients to your

20

compelled to do much more than fill out and file a form. Far from distancing themselves from the objectionable coverage, the Individual Plaintiffs are forced to sign up and pay for it, unless they want themselves and their families to be uninsured and to pay fines. They must actually provide financial support for the objectionable contraceptive coverage, just like the plaintiffs in *Hobby Lobby*. The Majority does nothing to address that distinction between *Geneva* and this case.

> 2. *Using, Supporting, or Advocating the Use of Contraceptives*

The Majority next turns to the words of the Individual Plaintiffs' Complaint, where they object to "using, supporting, or otherwise advocating, the use of abortifacients, or participating in a health insurance plan that covers such items for themselves or their families." (Verified Compl. ¶ 158.)[17] The Majority first claims that signing up for an

---

employees," it may not help to add "and don't worry, you will not be complicit in what's going to happen as soon as you file that paperwork."

[17] The Majority ignores this statement of the Individual Plaintiffs in their Verified Complaint defining their burden: "the Real Alternatives employees and their families object, on the basis of their sincerely held ethical and religious beliefs, to participating in, and/or paying a portion of the premium for, a health insurance plan which provides coverage for objectionable items for themselves and their family members." *See* Verified Complaint at ¶ 46. That particular iteration of the burden focuses on the financial aspect of

21

insurance plan that covers contraceptive coverage does not involve the "use, support, or advocacy of contraceptives" because "[c]hecking off a box to be eligible for reimbursement of services … of the employee's choosing … in no way indicates, let alone suggests, support or advocacy for that service." (Maj. Op. at 44.) That conclusion relies on the Majority's perception of how insurance coverage works:

> The plan deems the employee eligible to be reimbursed for hundreds of different services, and that employee can take advantage of that eligibility as he or she sees fit. Should the employee opt to use a particular service, he or she fills out a form and asks to be paid back for costs incurred. In the end, the employee uses a covered service, or not; either way, there is no requirement to support or advocate for whatever service he or she, or others, selects.

(*Id.*)

As my colleagues see it, because the Individual Plaintiffs can elect not to use the covered contraceptives, they are not burdened by having to pay for the coverage. The message is "get over it." And that seems to me to be only a "thinly-veiled attack" on sincerely-held religious beliefs.

---

paying into a plan that supports contraceptive services. The Majority has completely ignored the financial consequences of the Mandate, so it is perhaps not surprising that they have chosen to attend solely to a portion of the Complaint that does not mention those consequences.

22

*March for Life*, 128 F. Supp. 3d at 129. When the Individual Plaintiffs say in their Verified Complaint that it is at odds with their religious beliefs to purchase a plan which uses their money to offer products and services they believe to be morally abhorrent, I think we are supposed to believe them.

And we should, because their concern that their money will be used to support contraceptives is perfectly logical. It is the Majority's characterization of how the insurance market functions that is confused. It overlooks two essential truths: money is fungible and insurance is based on the pooling of risk. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2585 (2012) (The requirement that everyone must purchase health insurance "forces into the insurance risk pool more healthy individuals, whose premiums on average will be higher than their health care expenses. This allows insurers to subsidize the costs of covering the unhealthy individuals the [ACA] reforms require them to accept."). In the government's own words, the system "works through 'risk pooling in the group market' which 'results in sharing … costs … across an entire plan or employee group.'" (Responding Br. at 23-24 (quoting 75 Fed. Reg. at 41,730).) Thus even when the Individual Plaintiffs elect not to use contraceptive coverage, they still pay for and thus support it. *See id.* at 24 (noting that the plans "cover a wide array of services … [and insurers] set rates based on standardized policies [that] ensure[] that medical costs are spread across the entire pool of plan beneficiaries"). It is peculiar, then, for the Majority to claim that purchasing an insurance plan that includes contraception "does not assure the availability of specific services." (Maj. Op. at 45.) While an individual must seek out and use a particular service, the point of health

23

insurance is in fact to help facilitate and support access to each service for everyone in the risk pool.

Taken to its logical conclusion, my colleagues' position means that the Contraceptive Mandate could only be a "substantial burden" on the exercise of religion if the government forced religious objectors not only to buy plans with contraceptive coverage, but also to buy the covered contraceptives. That idea was rejected by the Supreme Court in *Hobby Lobby*, when it determined that providing coverage to employees, who may or may not elect to use the contraceptive coverage, was a substantial burden on the exercise of religion.[18] *See Hobby Lobby*, 134 S. Ct. at 2778 ("The Hahns and Greens believe that providing the coverage demanded by the HHS regulations is connected to the destruction of an embryo in a way that is sufficient to make it immoral for them to provide the coverage."). The Majority here may prefer the position taken by the dissent in *Hobby Lobby*, *see* 134 S. Ct. at 2799 (Ginsburg, J., dissenting) ("I

---

[18] The Majority makes an artificial distinction and says that while the Contraceptive Mandate "requires nothing of the employees that implicates their religious beliefs" the Mandate did affect the employers in *Hobby Lobby* because it "literally required" them to "'arrange for' contraceptive coverage in a way that effectively amounted to sponsorship." (Maj. Op. at 51 (quoting *Hobby Lobby*, 134 S. Ct. at 2775)). That purported difference is meaningless – in both *Hobby Lobby* and here the claimants were forced to financially support others' use of contraceptives, an action that was antithetical to their religious beliefs. As in *Hobby Lobby*, "it is not for us to say [whether] the[] religious beliefs are mistaken or insubstantial." 134 S. Ct. at 2778.

24

would conclude that the connection between the families' religious objections and the contraceptive coverage requirement is too attenuated to rank as substantial. The requirement carries no command that Hobby Lobby or Conestoga purchase or provide the contraceptives they find objectionable."), but that was the losing argument, as it should have been.

3.    *Participating in a Plan*
*Containing Contraceptives*

The Majority next focuses its attention on the Individual Plaintiffs' claim that participating in a health insurance plan containing coverage for contraceptives is a substantial burden on their free exercise. In doing so, my colleagues reduce the Individual Plaintiffs to non-entities in the calculus of harm. The Majority's argument is that the Individual Plaintiffs do not meaningfully "participate" in the acquisition of their health insurance coverage, so the market regulation forcing all but exempt plans to carry contraceptive coverage cannot be a substantial burden on them. There is, however, no sound legal or logical foundation for that position.

To begin, the Majority claims that there is no "active 'participation'" by an individual in subscribing to an insurance plan. (Maj. Op. at 45.) Their argument is that the concepts of "buy into" and "participate in" are not "interchangeable[,]" therefore when individuals purchase an insurance plan, they do not participate in it. (*Id*.) This is a semantic distinction without difference. And even assuming that the "active" participation requirement had a basis in our case law (which it does not), being an insurance plan

participant should fit the bill. "[H]ealth insurance does not exist independently of the people who purchase it," *March for Life*, 128 F. Supp. 3d at 129, and the purchasers are not designated by the insurers as "plan participants" for nothing. As already explained, the Individual Plaintiffs are not simply paying for the services they elect to use; they are participants in a plan that pools risk and provides comprehensive coverage. They are paying for all services, even those they individually decline to use, thus their participation in the plan directly subsidizes the use of contraceptives. That is hardly "remote facilitation." (Maj. Op. at 48) (citation omitted). What's more, the Majority completely ignores that "participation" in the insurance market is compelled – and enforced with a significant monetary penalty.[19] Being required to associate with and subsidize an organization or activity that one disagrees with does indeed impose a substantial burden on religion.

The Majority also makes a nearly identical argument using a slightly different term – directness. But, deploying a synonym does not improve the argument that the Individual Plaintiffs can be ignored as playing no "active 'role'" in their

---

[19] By ignoring the fact that the Individual Plaintiffs are forced to buy health insurance, the Majority attempts to make the central question whether or not a health insurance purchaser meaningfully "participates" in their insurance plan. But that is not the question RFRA asks. The proper inquiry is whether government action substantially burdens religion. Where the "participation" is abhorrent to the claimants' religion – and it is compelled – it should be plain that their religious exercise is substantially burdened.

health plans. (Maj. Op. at 45.) Even if the Individual Plaintiffs' burden or participation could rightly be characterized as "indirect" in some way, nothing requires a burden to be "direct" to be cognizable under RFRA. *See Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439*,* 450 (1988) ("It is true that this Court has repeatedly held that indirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment.").[20]

---

[20] The Majority chides me for not including a fuller quotation in the parenthetical to this citation to *Lyng v. Northwest Indian Cemetery Protective Association,* 485 U.S. 439 (1988). (Maj. Op. at 49-50 n.29.) But the Supreme Court itself, in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, recently relied on *Lyng* for that precise principle, noting that "the Free Exercise clause protects against 'indirect coercion or penalties on the free exercise of religion, not just outright prohibitions.'" 137 S. Ct. 2012, 2022 (2017) (quoting *Lyng*, 485 U.S. at 450).

Also, according to my colleagues, the *March for Life* opinion that they spend so much time belittling actually supports them on the significance of "direct vs. indirect" burdens. But in the quotation the Majority borrows, the *March for Life* opinion simply acknowledged the fact that the Contraceptive Mandate regulated insurers in the first instance. *See March for Life*, 128 F. Supp. 3d at 129 (noting that individuals are not "the direct objects" of the Contraceptive Mandate). That does not mean that purchasers are unaffected. In reality, the labels "direct" and "indirect" are too malleable to be of any real use in this context. By regulating the types of plans insurance companies can offer, and then forcing individuals to purchase those plans, the government is, in a

27

My colleagues also draw a number of analogies in an effort to demonstrate why this case does not involve a substantial burden. None ring true. They hypothesize someone alleging a substantial burden when subscribing to a magazine, or joining an organization, or acquiring a credit card. According to the Majority, "there is no active 'participation'" in any of these scenarios because "[t]hese are all packages that involve a one-time enrollment, followed by essentially passive eligibility for certain services that the member opts in or out of." (Maj. Op. at 45.) My colleagues again completely ignore that purchasing health insurance in the era of the ACA is far from voluntary – it is compelled and enforced with a monetary fine. Their examples are therefore meaningless. Of course subscribing to a magazine would be a substantial burden under RFRA if it were abhorrent to the subscriber's religious beliefs and were forced upon him by the government.[21] The same is true for compelled membership in an organization.

very real sense, directly acting on individuals. Moreover, the Majority has ignored the rest of the discussion in *March for Life*, which lays out why the Mandate is a substantial burden. *See id.* ("While it is true that an asserted burden is also not an actionable substantial burden when it falls on a third party, not the religious adherent … health insurance does not exist independently of the people who purchase it." (internal citations and quotations omitted)).

[21] Jefferson was right: "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209, 235 n.31 (1977) (quoting I. Brant, James Madison: The Nationalist 354 (1948)).

28

The credit card and banking analogy fares no better. My colleagues say that, as in the insurance market, "accountholders [at a bank] have no say in lending decisions (what rates to charge, which borrowers to lend to) and no direct control over the bank." (Maj. Op. at 46 n.25.) Accordingly, if we were to "[a]ssume that the individual's bank account is mandated by the Government under a privatized Social Security regime" and "an accountholder had a religious objection to the bank's practices" such as "lending money at interest[,]" that accountholder could not "successfully vindicate his or her religious beliefs through RFRA." (*Id.*) I disagree. In that hypothetical, it would undoubtedly impose a substantial burden on religion to force such believers to put their money into an interest bearing account contrary to their religious beliefs. [22] The consequence of determining that there was a substantial burden would not be to prevent the government from instituting a privatized Social Security regime. The consequence would be to force the government to satisfy strict scrutiny before forcing the religious objector to

---

[22] Those who desire to follow prohibitions on usury in the Torah and Quran often avoid traditional banking or enter into alternative arrangements with banks. *See, e.g.,* Naureen S. Malik*, Interest-Free Financing for U.S. Muslims*, ABC News http://abcnews.go.com/Business/story?id=87070 (explaining that there are two relevant Islamic prohibitions, "[o]ne against the use of ribaa or ribit, also known as usury; and the other against gharar, the unbundled sale of risk, such as gambling, insurance or derivatives[,]" and noting that banks will offer alternative arrangements to comply with those prohibitions).

29

participate.[23]  *See United States v. Lee*, 455 U.S. 252, 260-61 (1982) (analyzing whether Social Security satisfied strict scrutiny with respect to an Amish objector).

[23] The Majority's analogies are troubling not only under RFRA, but also under the Constitution.  *See W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").  The proposals suggested by the Majority would violate the First Amendment in more ways than one.  In the association context, the Supreme Court has repeatedly found that being forced to subsidize and affiliate with an organization one disagrees with clearly burdens freedom of association and expression, even when the cost of membership is de minimis and there is no additional requirement to participate.  *See, e.g., Harris v. Quinn*, 134 S. Ct. 2618, 2639, 189 L. Ed. 2d 620 (2014) (striking down compelled labor union membership requirements); *Keller v. State Bar of California*, 496 U.S. 1, 6, (1990) (finding mandatory bar dues that were used for ideological or political educational programs violated the First Amendment).  Likewise, free speech protections prevent the government from compelling an individual to subsidize or facilitate expression of speech that one disagrees with.  *See, e.g., Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974) (holding that the government cannot require a newspaper to provide space for the expression of certain viewpoints); *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1 (1986) (rejecting a law that forced a power company to

In the end, the Majority's claim that the Individual Employees do not meaningfully participate in their health care plans cannot be saved by the hypotheticals on which they rely. Each ignores that the government has coerced the Individual Plaintiffs to purchase health insurance with provisions deeply offensive to their sincerely held religious beliefs. The hypotheticals thus serve only to underscore the weakness of the Majority's argument.

### 4. *"Incidental" Effects and* Lyng

To bolster its arguments regarding "direct" and "active" participation, the Majority tries to link this case and *Geneva* to *Lyng v. Northwest Indian Cemetery Protective Association.* In that case the Supreme Court concluded that the government's building of a road on public land used for religious purposes by Native Americans was not a violation of their right to Free Exercise. 485 U.S. at 447-53. My colleagues also make passing reference (Maj. Op. at 40) to *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986), a Supreme Court case relied upon in *Lyng* which held that requiring the use of social security numbers to participate in federal food stamp and aid programs was not a significant burden on religious beliefs. *See Bowen*, 476 U.S. at 699-700.

*Bowen* and *Lyng* are distinguishable. Both cases recognized the difference between challenges to "certain forms of governmental compulsion" and policies that amounted to the "Government's internal procedures."

allow public interest groups to share a message on its billing envelopes).

31

*Bowen*, 476 U.S. at 700. In *Bowen*, because the assignment of a social security number did not require the religious objectors to do anything, the Court found that the law fell into the latter category. *Id.* (recognizing that religious protections under the Free Exercise clause extend to "what the government cannot do to the individual, not in terms of what the individual can extract from the government") (quotation omitted). And in *Lyng*, the same was true: the claimants sought to stop government action that affected their religious practice (i.e. building a road through their lands), but did not compel their own behavior. *Lyng*, 485 U.S. at 449 ("In both cases, the challenged Government action would interfere significantly with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs. In neither case, however, would the affected individuals be coerced by the Government's action into violating their religious beliefs; nor would either governmental action penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens."). By contrast, the ACA forces the Individual Plaintiffs to engage in certain behavior – purchasing health insurance – and enforces that compulsion with the threat of a significant fine.

My colleagues, however, fixate on the Supreme Court's observation in *Lyng* that an incidental effect of a government program with "no tendency to coerce individuals into acting contrary to their religious beliefs" is not violative of the First Amendment. (Maj. Op. at 49 n.29.) (quoting *Lyng*, 485 U.S. at 450-51). Of course, I do not disagree with that limitation. But the Majority is fighting a losing battle with common sense when it argues that imposing financial penalties on individuals who fail to take action that violates their religion has "no tendency to coerce." The Mandate

32

coerces the Individual Plaintiffs into violating their beliefs by forcing them to purchase a health care plan at odds with their religious convictions. *See* Verified Complaint at ¶ 46 (JA 99-100) ("[T]he Real Alternatives employees and their families object, on the basis of their sincerely held … religious beliefs, to participating in, and/or paying a portion of the premium for, a health insurance plan which provides coverage for objectionable items for themselves and their family members."). Thus, the Individual Plaintiffs here are not challenging the way the government "conduct[s] its own internal affairs," (Maj. Op. at 40 (quoting *Bowen*, 476 U.S. at 699)); they are challenging what a government regulation requires them to do.[24] As the Supreme Court's recent holding

---

[24] The Majority's collection of out-of-Circuit cases is also not persuasive. I will spare the reader an extensive response to each and every one of the cases cited by the Majority in its lengthy footnote 33. Broadly speaking, however, the cases cited are simply inapplicable or distinguishable. For instance, some of the cases involve situations where the government offered an accommodation for religious belief. *See, e.g., United States v. Friday*, 525 F.3d 938, 947-48 (10th Cir. 2008) (upholding a law creating a general prohibition on hunting bald eagles but allowing Native Americans to apply for a permit if they need to hunt for religious reasons); *Berman v. Bd. of Elections*, 420 F.2d 684, 685–86 (2d Cir. 1969) (concluding a case was moot where the municipality permitted an individual to vote in another polling place when voting in a Church violated his religious beliefs). Others recognized that claimants could exercise their religion, without government penalty, in closely analogous circumstances that did not impose a burden. *See, e.g., Henderson v. Kennedy*, 253 F.3d 12, 17 (D.C. Cir. 2001)

33

in *Trinity Lutheran* demonstrates, laws that coerce religious claimants to disavow their religion in order to receive a government benefits are inconsistent with our constitutional traditions. *Cf. Trinity Lutheran*, 137 S. Ct. at 2022 (finding "express discrimination" under the First Amendment where a church was denied the opportunity to compete for a government benefit "solely because it is a church).[25]

(upholding a law preventing sale of t-shirts on the National Mall against a RFRA challenge because the religious individuals seeking to sell their shirts on the Mall had not shown why selling on the Mall rather than a few blocks away was required by their religious beliefs); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc., v. City of Lakewood*, 699 F.2d 303, 307–08 (6th Cir. 1983) (upholding a zoning ordinance that limited locations where churches could be built where there was no suggestion that building in the approved zone would impose a prohibitive cost or interfere with the religious mission of the Church). Most fundamentally, none of these cases involved challenges to government action that forced individuals to act contrary to their religious beliefs under threat of government fine.

[25] The Majority says that *Trinity Lutheran* is not relevant because it is "not a RFRA case[.]" (Maj. Op. at 41 n. 29.) But First Amendment cases based on the Free Exercise clause certainly are relevant to understanding the meaning and application of RFRA. *See Hobby Lobby*, 134 S. Ct. at 2778-79 (relying on pre-RFRA cases to analyze a substantial burden under RFRA); (Maj. Op. at 43 (relying on *Lyng*, a pre-RFRA case)). And whether the Supreme Court was "[s]ignaling its intent to confine its holding" (Maj. Op. at 50 n.29) in *Trinity Lutheran* with a footnote is far from clear.

The Majority also dresses up the "incidental" point in different language and says that RFRA bars claims arising out of burdens on third parties. The faulty logic is that, because the Contraceptive Mandate only regulates the insurer and not the Individual Plaintiffs, it cannot be a substantial burden under RFRA. *See* (Maj. Op. at 55 ("The Supreme Court has consistently rejected the argument that an independent obligation on a third party can impose a substantial burden on the exercise of religion in violation of RFRA." (quoting *Geneva*, 778 F.3d at 440-41))). But the Individual Plaintiffs do *not* object to insurance companies offering plans with contraceptive coverage, making the cases the Majority relies on about third parties irrelevant. The Individual Plaintiffs are only asking the government to allow them to purchase a plan that does not include the offending coverage – a request that, according to this record, would not impose any harm or burden on any third parties. There evidently are insurers prepared to fill that market demand, just as there were before the ACA told all insurers that they had to eliminate that choice.

5.      *Opening the Floodgates*

The Majority also relies on a floodgates argument to hold that the Individual Plaintiffs have not experienced a

*See Trinity Lutheran*, 137 S. Ct. at 2026 (Gorsuch, J., concurring) (voicing concern that courts would "mistakenly read" that footnote to narrow the scope of the court's holding and pointing out that doing so was "unreasonable" because cases are "governed by general principles, rather than ad hoc improvisations." (citation omitted)).

substantial burden on their free exercise of religion. My colleagues worry that allowing the Individual Plaintiffs to maintain a RFRA claim would open the way to myriad challenges to the ACA, because "the categories of services that could offend religious beliefs [are] wide-ranging." (Maj. Op. at 52.) Thus, "denying … such services to *all* on the basis of the religious objections of *some* would be neither desirable nor administrable." *Id*.

Of course, that fails to address the burden issue at all. It is merely an assertion that, regardless of the burden on religious belief, it could be difficult for the government to do what it wants if any accommodation for religious believers must be made. Sadly, this argument is "the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006). It is also the reasoning of the dissent in *Hobby Lobby*, which worried that allowing a RFRA challenge to one part of the ACA "would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind." 134 S. Ct. at 2785 (quoting *Smith*, 494 U.S. at 888-89). But the Majority in *Hobby Lobby* rightly rejected that hyperbolic concern, recognizing that the judiciary is bound to apply the balancing test set forth by RFRA to adjudicate such claims. *See id.* ("But Congress, in enacting RFRA, took the position that 'the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.'" (quoting 42 U.S.C. § 2000bb(a)(5))). The command "to enforce RFRA as written[,]" *id.,* requires us to avoid imagining a speculative "parade of horribles" as a

counterweight to the real burden on real people. *March for Life*, 128 F. Supp. 3d at 132; *see also Gonzales*, 546 U.S. at 434 ("RFRA, however, plainly contemplates that *courts* would recognize exceptions—that is how the law works." (citing 42 U.S.C. § 2000bb-1(c))).[26]

Nevertheless, because the Majority has cited concern for the insurance markets as a reason to walk away from RFRA, it bears emphasis that there is a simple answer to that concern.[27] It was given by Judge Richard Leon of the United

---

[26] The Majority criticizes my reliance on *Gonzales* because that opinion does not address the Majority's "concerns regarding the end-run on legislation" that would be "unleash[ed]" by adjudicating the Individual Plaintiffs' RFRA claim. (Maj. Op. at 57 n.34.) But courts are bound to adjudicate the substantial burden inquiry under RFRA based on the facts before them. *Cf. Morrow v. Balaski*, 719 F.3d 160, 201 (3d Cir. 2013), *as amended* (June 14, 2013) (Fuentes, J., dissenting) ("[W]e ought not refuse to grant relief that is warranted simply to stem future litigation."). And *Gonzales* did address an argument that the "effectiveness" of the regulation at issue would be "necessarily undercut" by granting an exception. 546 U.S. at 434. The Court rejected that speculation. *See id.* at 435 (finding that there was "no evidence" that allowing a RFRA exemption for claimants would "undercut the Government's ability to enforce" the law with respect to non-claimants).

[27] My colleagues claim that the existence of an alternative plan is only relevant to "standing and questions of redressability" (Maj. Op. at 58 n.36), and yet they emphasize concerns about the workability of the insurance market in

37

States District Court for the District of Columbia in his thoughtful rebuttal of the "parade of horribles" argument in the *March for Life* case. He demonstrated that the Majority's argument has no real weight because "[i]nsurance companies have every incentive to maintain a sustainable and functioning market … ."[28] 128 F. Supp. 3d at 132. Thus,

---

their substantial burden analysis. *See* (*Id*. at 56-57 (worrying that "a finding that coverage for one set of objectionable services constitutes a substantial burden would imply that coverage for all such services imposes a substantial burden – an implication that would render the health care system totally unworkable" (citations and internal quotation marks omitted))). As ought to be clear from their own concerns, the likely availability of alternative insurance plans is relevant to the merits aspects of the case.

[28] My colleagues try to rebut this point by dragging a red herring across the trail: they argue that my position means I am hostile to all regulation. *See* (Maj. Op. at 58 n.35) (characterizing my position as concluding that "any regulation of any market is unnecessary"). Even if that were true, and it most assuredly is not, it is irrelevant to the discussion. To be clear, I am not arguing that all regulation is devoid of value. I am simply stating that, if we conclude that individual religious adherents are substantially burdened by the regulation, granting them an exemption will not take down the system. The fact that they will have to find an insurer – one which is subject to market forces – to provide them with their desired plan demonstrates that their request will not unravel the system. If it did present that threat, no insurer would offer such a plan. And we know that at least one insurer is likely to offer such a plan. *See March for Life*,

38

"the government's interest in the same would not be undermined by simply making it legal for a third-party provider to offer, without penalty, a plan consistent with [Individual] [P]laintiffs' religious beliefs." *Id.* In the event that "offering an insurance plan that does not include a service or services to which a potential purchaser objects on religious grounds would be 'an impossible administrative

---

128 F. Supp. 3d at 123 n.6 (recognizing that an insurer was willing to offer a contraception-free plan). What's more, we know that, before the ACA forbade markets to respond to consumer demand, many insurers offered such plans and the United States managed to have a functioning health insurance market.

The seatbelt analogy the Majority offers is passing strange but must, I suppose, have an answer. First, automobile regulations recognize safety concerns for the public generally – who knows who will ride in a vehicle; it could be any number of people, and protecting them has been deemed wise, so the government did not wait for market forces to work. That safety concern is unlike anything related to the Contraceptive Mandate and the insurance market. Strangers do not get in and out of your policy as they can get in and out of your car. Moreover, if one were to imagine an anti-seatbelt religious sect (a thought exercise which seems to demean the religious concerns actually at issue in this case), there is no warrant for fearing that, if the government permitted members of that sect to buy a car without seatbelts or to remove the belts after buying the car, the U.S. automobile industry would cease to function.

39

undertaking,' insurance companies will not do it." [29]  *Id.* When we leave to the insurance companies themselves the decision of what coverage options they can profitably provide, it is obvious that the "parade of horribles" will not begin to march.  *See id.*  The market managed to provide coverage options before the ACA and it is a good bet it can do so again.

### 6.      *"Substantial" Burden*

My colleagues repeatedly highlight that government action must *substantially* burden religion in order to be cognizable under RFRA, citing *Geneva* and legislative history as proof that the weight of the burden is "the very essence of a RFRA claim[.]" (Maj. Op. at 42.)  They say that, even if there is a burden on the Individual Plaintiffs, it is not enough to be considered "substantial."   That is the comfortable rationale.   "No matter how sincerely held [the Individual Plaintiffs'] beliefs may be, we cannot accept at face value that subscribing to the plan imposes a '*substantial* burden.'" (*Id*. at 59.)    In articulating that conclusion, my colleagues

---

[29] The Majority argues that I am operating on a false premise because "[i]nsurance companies have an interest in a sustainable and functioning insurance market only to the extent that it is profitable for them." (Maj. Op. at 57-58.) But that is exactly my premise and it is not false. Long-term profits are only realizable in a sustainable and functioning market. If the cost of providing plans with carve-outs for conscience threatens the viability of the insurance market, such plans will not be offered, and they will not be offered precisely because insurance companies are motivated by profit.

recognize that their characterization is "a matter of subjectivity," as indeed it is. *Id.* at 48.

They are, of course, correct that the plain language of RFRA forbids the government from "substantially burden[ing]" a claimant's exercise of religion. 42 U.S.C. § 2000bb-1(a); *Cf. Paek v. Attorney Gen. of the U.S.*, 793 F.3d 330, 334 (3d Cir. 2015) ("[W]e do not resort to legislative history to cloud a statutory text that is clear." (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994))). But as I have already endeavored to show, the compelled action here is indeed a substantial burden. It seems to me that the disagreement we have in this case is not fundamentally about the burden; it is about the underlying belief.

The Majority claims that I have made the misstep of "conflat[ing]" the duty to analyze whether a burden is substantial with our obligation to accept the validity of a claimant's religious belief. (Maj. Op. at 43 n.24.) But, I have addressed the two questions distinctly, *see supra* at 12 ("Once we have determined that an adherent has an honest conviction, we ask if the government regulation imposes a substantial burden on adherence to that conviction."), knowing that caution is needed because an evaluation of the substantiality of a burden can easily cross into the forbidden territory of opining on the merits of a claimant's beliefs. *See Hobby Lobby*, 134 S. Ct. at 2777-78 (recognizing that focusing on the closeness of "connection between what the objecting parties must do … and the end they find to be morally wrong" in reality "dodges the question that RFRA presents … and instead addresses a very different question that the federal courts have no business addressing").

41

It is the Majority's approach that runs afoul of binding precedent,[30] and my colleagues' rejection of the deference we

<hr />

[30] In support of its interpretation of the substantiality requirement, the Majority repeatedly cites to the dissenting opinion in *Hobby Lobby*, *see* (Maj. Op. at 46-47; 51 n.30), as well as secondary sources arguing against the majority opinion in *Hobby Lobby*, *see, e.g.,* Frederick Mark Gedicks, *"Substantial" Burdens: How Courts May (and Why They Must) Judge Burdens on Religion Under RFRA*, 85 Geo. Wash. L. Rev. 94, 101 (2017) (lauding the dissent in *Hobby Lobby* for "question[ing]" what it characterizes as "a doctrinal regime that renders RFRA's substantial burden element functionally nonjusticiable"); Matthew A. Melone, *Corporations and Religious Freedom:* Hobby Lobby Stores—*A Missed Opportunity to Reconcile a Flawed Law with a Flawed Health Care System*, 48 Ind. L. Rev. 461, 503 (2015) (taking the position that "an imposition on conscience" that arises from the Mandate "is not a burden on exercise at all"). Those writings may make for interesting reading but they are not the law, no matter how earnestly the Majority wishes they were. Legal academics are free to disregard Supreme Court precedent, but we are not. On many difficult issues, including this one, there are law review articles with varying perspectives, *compare* Gedicks, *supra*, *with* Scott W. Gaylord, *RFRA Rights Revisited: Substantial Burdens, Judicial Competence, and the Religious Nonprofit Cases*, 81 MO. L. REV. 655 (2016) (arguing that *Hobby Lobby* precludes courts from considering the weight of the burden imposed on religious claimants), but that intellectual variety does not mean courts can adopt the reasoning they find most appealing, rather than abiding by controlling Supreme Court

owe to the Individual Plaintiffs' convictions is at odds with the respect that has historically governed our approach to expressions of religious belief. "The religious views espoused by respondents might seem incredible" to some people, "[b]ut if those doctrines are subject to trial … [to determine] their truth or falsity, then the same can be done with the religious beliefs of any sect." *United States v. Ballard*, 322 U.S. 78, 87 (1944). When judges wade into those waters, "they enter a forbidden domain." *Id.*; *see also* James Madison, Memorial and Remonstrance against Religious Assessments, Papers 8:298—304 (June 20, 1785) (critiquing the notion that a civil judge can be "a competent Judge of Religious Truth"). My friends in the Majority do not simply wade in; they dive in with gusto, commenting that their analysis allows them to "enumerate[] [each] allegation in turn, and … conclude that the Real Alternatives Employees have failed to demonstrate that the Contraceptive Mandate forces them to violate their religious beliefs." (Maj. Op. at 43.)

I sincerely wish that this were not the Majority's analytical approach. In a powerful dissent from the denial of en banc review in the *Little Sisters of the Poor* case, Judge Harris Hartz of the Tenth Circuit pointed out how fraught with ill-consequences it can be.[31] Calling it a "dangerous

---

precedent. We are required to follow *Hobby Lobby*, and I am pleased to do so since its reasoning is entirely persuasive.

[31] The Majority criticizes my reliance on the dissenting opinion in *Little Sisters*. I cite it as persuasive, not binding, authority. And I note that the majority opinion in *Little Sisters* was vacated by the Supreme Court in *Zubik v.*

43

approach to religious liberty," Judge Hartz asked whether our country could "really tolerate letting courts examine the reasoning behind a religious practice or belief and decide what is core and what is derivative?" *Little Sisters*, 799 F.3d at 1317 (Hartz, J., dissenting). He used two examples to demonstrate the serious problems raised by a what's-the-big-deal approach. First, it could require a Christian "to work on December 25 because, according to a court, his core belief is that he should not work on the anniversary of the birth of Jesus but a history of the calendar and other sources show that Jesus was actually born in March." *Id.* Next, he said it would allow the government to provide a Jewish prisoner with "only non-kosher food because the real purpose of biblical dietary laws is health, so as long as the pork is well-cooked, etc., the prisoner's religious beliefs are not substantially burdened." *Id.* at 1317-18. Such reasoning is "contrary to all precedent concerning the free exercise of religion." *Id.* at 1318.

I agree with Judge Hartz and decline to question the Individual Plaintiffs' religious beliefs under the guise of adjudicating "substantial burden." I respect their convictions and conclude that the Contraceptive Mandate – which forces them, under threat of monetary penalty, to sign up for and participate in a system that violates their devoutly held beliefs about human life – is a substantial burden on their exercise of religion.

---

*Burwell*, 136 S. Ct. 1557 (2016). Moreover, my colleagues in the Majority are not consistent in their rejection of dissenting opinions. *See* (Maj. Op. at 46-47 (favorably describing the dissent in *Hobby Lobby*).

## C.     Strict Scrutiny

Because the Individual Plaintiffs are "substantially burdened" by the Contraceptive Mandate, I turn to the "strict scrutiny" questions the Majority does not address: whether the government action is "in furtherance of a compelling government interest" and is the "least restrictive means" of achieving that interest.  *See* 42 U.S.C. § 2000bb-1(b).  That standard is "exceptionally demanding," *Hobby Lobby*, 134 S. Ct. at 2780, and the government's arguments are inadequate.  Along with many others who have considered the matter, I do not believe that the Contraceptive Mandate can survive strict scrutiny. [32]  *See id.* ("HHS has not shown that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting parties in these cases."); *March for Life*, 128 F. Supp. 3d at 131 ("The final question the Court must ask under RFRA is whether the current Mandate is the least restrictive means of serving this governmental interest.  Assuredly, it is not!"); *Wieland,* 196 F. Supp. 3d at 1019 (holding that the "government has not met its burden" to satisfy RFRA).  I

---

[32] The Majority avoids this step in the analysis by holding that the Individual Plaintiffs are not substantially burdened by the Mandate.  My colleagues claim that I am wrong to recognize that the Mandate has not survived strict scrutiny on repeated occasions because only two courts have "addressed the precise question before us today."  (Maj. Op. at 59 n.37.)  It is true that only two courts have faced the identical dilemma, *see supra* p. 16-17, but I am confident that the outcomes in the avalanche of related litigation the Mandate has spawned are relevant, *see, e.g., Hobby Lobby*, 134 S. Ct. at 2779-81, and that is what I have referred to.

45

consider in turn both the interest initially advanced by the government – access to contraception – and the government's newly discovered interest – a universal health care system.

### 1. *Access to Contraception*

In *Hobby Lobby*, the majority opinion assumed without deciding that one interest proffered by the government was compelling: "ensuring that all women have access to all FDA-approved contraceptives without cost sharing." 134 S. Ct. at 2779. If that is a given, the question becomes whether the Mandate is the least restrictive means of furthering that compelling government interest. The test is sometimes framed as an inquiry into whether the means is "precisely tailored" to meet the compelling interest. *Id.* at 2783; *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993) (recognizing in the Free Exercise context that a burden on religion "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest"). The *Hobby Lobby* Court concluded that there were several other options available to the government to meet that interest, the most straightforward of which would be for "the government to assume the cost of providing the contraceptives at issue to any women who are unable to obtain them under their health-insurance policies due to their employers' religious objections." 134 S. Ct. at 2780. Here, the government could surely do the same thing, defraying the cost of contraceptive coverage to the extent necessary to make up for the absence

of people in the insurance pool who decline the coverage.[33]  If allowing some people to opt out of the Mandate ended up costing any significant amount, the government – whose interest it is – could absorb the cost.  *See id.* at 2781 ("RFRA … may in some circumstances require the government to expend additional funds to accommodate citizens' religious beliefs.").

In *Hobby Lobby*, the Supreme Court observed that the government had "already established an accommodation for nonprofit organizations with religious objections[,]" *id.* at 2782, and the very existence of that accommodation proved that less restrictive means could be used to reach the government's ends.  *See id.* (considering that the accommodation would "not impinge on the plaintiffs' religious belief … and it serves HHS's stated interests equally well").  The same is true here.  The government briefly argues that an accommodation cannot be possible for individual buyers of insurance, saying that exemptions to the Mandate "apply only to employers … not individuals."  *See* (Gov. Br. at 29 (quoting District Court Opinion, JA 76)).  But the government does not justify why employers deserve an accommodation and individuals do not.  Indeed, the argument is quite an about-face from the position the government took in *Hobby Lobby* and *Conestoga Wood*, when it contended loudly that only individuals could have religious scruples and the companies who employed them could not.  *Hobby Lobby*, 134 S. Ct. at 2774 ("HHS contends that Congress could not

---

[33] It is not clear that the government would need to step in at all, since the number of people wanting to avoid such coverage is unknown.

have wanted RFRA to apply to for-profit corporations because it is difficult as a practical matter to ascertain the sincere 'beliefs' of a corporation."); *Conestoga Wood*, 724 F.3d at 403 (Jordan, J., dissenting) (noting the irony in the idea "religious belief takes shape within the minds and hearts of individuals" while denying religious liberty to "an entity that is nothing more than the common vision of five individuals from one family who are of one heart and mind about their religious belief"). The Individual Plaintiffs have proposed a number of ways the government could satisfy its interest in providing contraceptive coverage.[34]

Parties to the *Zubik* litigation also suggested ways that access to contraceptives could be provided without trampling on religious beliefs. *See Zubik v. Burwell*, Supp. Reply Brief For Petitioners, 2016 WL 1593773 at *1 (filed April 20, 2016) ("The government concedes … that its existing regulatory scheme 'could be modified' to eliminate the self-certification requirement for petitioners with insured plans without sacrificing its professed objective of 'ensuring that the affected women receive contraceptive coverage seamlessly.'") (quoting Respondent's Supp. Br. at 14-15). The Petitioners in *Zubik* outlined a solution in which "the insurance company [could be made to] make available to plan beneficiaries a separate plan providing the excluded

---

[34] The government could include religiously-objecting families in "existing federal family planning programs" that provide coverage for free or reduced rates; provide objecting families with "federal subsidies" to offset the cost of the coverage; or require the government to pay insurance companies directly for the added cost of contraceptive coverage. *See* (Opening Br. at 54-55).

contraceptive coverage" and separately "contact beneficiaries to inform them of that plan and how to enroll." *See Zubik*, Supp. Br. for Petitioners, 2016 WL 1445914 at *4 (filed April 12, 2016). The distinct plans would be akin to dental or vision insurance that are "truly" independent of general health insurance and have a separate enrollment process, insurance card, and payment source. *Id.* at *1. That same option could be provided to individuals purchasing health care on the open market.

The wisdom of those options may be debated, but not their existence, so the government's decision to simply refuse to engage in the discussion is telling. It appears that the government "has open to it [several] less drastic way[s] of satisfying its legitimate interest[]" and has made "no showing that any of the [Individual Plaintiffs'] alternative ideas would be unworkable." *See Conestoga Wood*, 724 F.3d at 414-15 (Jordan, J., dissenting) (citations omitted). Thus, the government's position cannot withstand strict scrutiny.

### 2. *A Uniform Health Care System*

Evidently recognizing that it cannot win if its interest is described as providing contraceptive coverage, the government actually abandons that position and declares it to be "irrelevant," (Responding Br. at 27), which is remarkable given how intensely it insisted that that interest was compelling before. Nevermind. It has a new set of interests now. In its words, "a compelling interest in the provision of health care and the functioning of the insurance market … [and] a corresponding 'interest in the uniformity of the health care system the ACA puts in place, under which all eligible citizens receive the same minimum level of coverage'" are

49

the only rationales we should consider. (Responding Br. at 25 (quoting *Priests for Life v. U.S. Department of Health & Human Services*, 772 F.3d 229, 265 (D.C.Cir. 2014)).)[35]

These sweeping claims fly in the face of the Supreme Court's command in *Hobby Lobby* that compelling government interests must be precisely defined. The Court there rejected the government's attempt to assert interests that were "couched in very broad terms, such as promoting 'public health' and 'gender equality.'" *Hobby Lobby*, 134 S. Ct. at 2779. Instead, it said, judges are "to loo[k] beyond broadly formulated interests and to scrutinize[e] the asserted harm of granting specific exemptions to particular religious claimants—in other words, to look to the marginal interest in enforcing the Contraceptive Mandate in these cases." *Id.* (alterations in original) (quotations omitted). A generalized interest in health care and insurance is too abstract to be compelling in a legal sense when addressing the Individual Plaintiffs' request for relief.

No more compelling is the government's claimed interest in uniformity of the Mandate's application. That claim cannot be given credence because millions of people have already been excepted. "The Mandate is a classic …

---

[35] There is more than a whiff of gamesmanship about the government's newly claimed compelling interest. In a strict scrutiny analysis, we ordinarily reject "*post hoc* rationalizations" for government action and instead rely on the "basis [for the regulation] articulated by the agency itself." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983).

example of … arbitrary underinclusiveness." *Conestoga Wood*, 724 F.3d at 414-15 (Jordan, J., dissenting). As the Supreme Court observed, "[a]ll told, the Contraceptive Mandate presently does not apply to tens of millions of people." *Hobby Lobby*, 134 S. Ct. at 2764 (internal quotation and citation omitted). "A law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Conestoga Wood*, 724 F.3d at 413 (Jordan, J., dissenting) (quoting *Church of Lukumi Babalu*, 508 U.S. at 547).[36] The government cannot persuasively declare that it has an interest in universality and uniformness – only to, at the same time, make the means decidedly not universal and

---

[36] In addition to the variety of exemptions from the employer mandate discussed in *Hobby Lobby*, 134 S. Ct. at 2764, there are also a wide variety of exemptions from the individual mandate. Significantly, there is an exemption for those who have membership in a religious sect that objects to insurance. 26 U.S.C. § 5000A(d)(2)(A). Additionally, individuals who participate in a previously-existing "health care sharing ministry" are exempted from the Mandate. 26 U.S.C. § 5000A(d)(2)(B) (defining a health care sharing ministry as a tax-exempt organization of members who "share a common set of ethical or religious beliefs and share medical expenses among members in accordance with those beliefs" that has existed since December 31, 1999). Those additional exemptions further underscore the Mandate's underinclusiveness.

51

uniform. Because of this incongruity, the claimed interest cannot credibly be characterized as compelling.[37]

---

[37] The United States Court of Appeals for the District of Columbia Circuit in *Priests For Life v. United States Department of Health & Human Services*, 772 F.3d 229 (D.C. Cir. 2014), *vacated and remanded sub nom. Zubik v. Burwell*, 136 S. Ct. 1557 (2016), accepted a number of government interests as compelling, including "a sustainable system of taxes and subsidies under the ACA to advance public health." *Id.* at 258. In considering the Mandate's furtherance of that interest, the court concluded that "[t]he government's interest in a comprehensive, broadly available system is not undercut by the other exemptions in the ACA, such as the exemptions for religious employers, small employers, and grandfathered plans." *Id.* at 266.

That holding is not binding on us and, in any event, is an assertion rather than a reasoned conclusion. The scope of the exceptions here is far more significant than the "narrow category" exempted from Social Security in *United States v. Lee*, 455 U.S. 252, 261 (1982). *See Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1143 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ("[T]he interest here cannot be compelling because the contraceptive-coverage requirement presently does not apply to tens of millions of people."). I am persuaded that the number of "*congressional* exemptions" to the Mandate demonstrate that the ACA does "not preclude exceptions altogether" and "RFRA makes clear that it is the obligation of the courts to consider whether exceptions are required under the test set forth by Congress." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 421, 434 (2006).

Charitably assuming that the government's interest is better understood as a functioning and comprehensive insurance market, the Mandate is again not the least restrictive means of achieving that interest. The government points to *United States v. Lee*, 455 U.S. at 257-258, to say a universal system can be the least restrictive means to achieve a compelling interest. True enough. But in *Lee*, the Supreme Court was considering taxation to provide a "comprehensive national social security system." *Id.* at 258. As Judge Leon pointed out in *March for Life*, there is a "critical distinction" between that scheme and the ACA:

> Unlike in *Lee*, the government does *not* provide the insurance at issue here, and there is no single "comprehensive national [health insurance] system." *See Lee*, 455 U.S. at 258, 102 S. Ct. 1051. Instead, the government *regulates* a host of third party insurers. The Mandate burdens employee plaintiffs' religious exercise by restricting the form in which those third parties can offer something that plaintiffs, for all intents and purposes, *must* buy.

*March for Life*, 128 F. Supp. 3d at 131–32.

Understood from that perspective, there is an obvious solution to further the government's interest: refrain from penalizing insurers who offer plans in accordance with the Individual Plaintiffs' beliefs. *Id.* at 132 ("The government need not *require* an insurer offer such a plan at plaintiffs' request in order to avoid burdening plaintiffs' religious exercise."). Because insurance companies would offer such plans as a result of market forces, doing so would not

53

undermine the government's interest in a "sustainable and functioning market." *Id.* And that remedy would also necessarily be limited in scope; it would not "enable [insurance companies] to refuse to provide [contraceptive] coverage to others who do not share those religious objections." *Id.* Because the government has failed to demonstrate why allowing such a system (not unlike the one that allowed wider choice before the ACA) would be unworkable, it has not satisfied strict scrutiny.

## III.    Conclusion

To the Majority, this is all much ado about nothing: the burden of signing forms and paying money in support of drugs, devices, and procedures that affect the well springs of human life is so slight it cannot be called substantial, so the Individual Plaintiffs should simply sign and pay and stop complaining. What my colleagues fail to appreciate is that coercing financial support for something deeply objectionable is a real and substantial burden, and a forced signature alone can be problematic. In matters of conscience, the signing of one's name is more than a scrawl on paper. Robert Bolt gave these compelling words to Sir (and Saint) Thomas More in the play "A Man for All Seasons": "When a man takes an oath, … he's holding his own self in his hands. Like water. And if he opens his fingers then – he needn't hope to find himself again."

The Individual Plaintiffs do not want to lose themselves. They have demonstrated the seriousness of the burdens forced upon them by the Contraceptive Mandate. Under RFRA, it thus became incumbent on the government to show that its actions are narrowly tailored to achieve a

compelling purpose. In my estimation, the government has failed to meet that exacting standard. I thus respectfully dissent and concur only in the judgment as to Real Alternatives, not in the judgment against the Individual Plaintiffs.